# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN TORDINI,** | : | |
| *Individually* | : | |
| *and derivatively* on behalf | : | **C.A. No. 02-2653** |
| of Derivative Plaintiff Our Turn, LLC | : | |
| **2637 S. 11th Street** | : | |
| **Philadelphia, PA 19148** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **ROBERT N. COYLE, SR.** | : | **JURY TRIAL DEMANDED** |
| **4 Walton Drive** | : | |
| **Sewell, NJ 08080** | : | |
| | : | |
| **CAROL COYLE** | : | |
| **4 Walton Drive** | : | |
| **Sewell, NJ 08080** | : | |
| | : | |
| **VERNON COYLE** | : | |
| **27 Wiltshire Drive** | : | |
| **Sewell, NJ 08080** | : | |
| | : | |
| **LINDA COYLE PRICE** | : | |
| **9603 Lavender Street** | : | |
| **Philadelphia, PA 19114** | : | |
| | : | |
| **THE COYLE FAMILY IRREVOCABLE** | : | |
| **FAMILY TRUST** | : | |
| **4 Walton Drive** | : | |
| **Sewell, NJ 08080** | : | |
| | : | |
| **R.N.C. INVESTMENTS, LLC** | : | |
| **4 Walton Drive** | : | |
| **Sewell, NJ 08080** | : | |
| | : | |
| **BRUCE BRYEN, CPA and** | : | |
| **BRYEN & BRYEN, LLP** | : | |
| **Certified Public Accountants** | : | |
| **100A Centre Boulevard** | : | |
| **Marlton, NJ 08053** | : | |
| | : | |

mak: 51447.1

**LANDVEST LLP**                          :
**2332 E. Allegheny Avenue**              :
**Philadelphia, PA   19134**              :
                                          :
**LANDVEST/LLP  II**                      :
**2332 E. Allegheny Avenue**              :
**Philadelphia, PA   19134**              :
                                          :
**LANDVEST/LLP  III**                     :
**2332 E. Allegheny Avenue**              :
**Philadelphia, PA   19134**              :
                                          :
**O'TAY, LLC**                            :
**2332 E. Allegheny Avenue**              :
**Philadelphia, PA   19134**              :
                                          :
**ALIVEST, LLP**                          :
**2332 E. Allegheny Avenue**              :
**Philadelphia, PA   19134**              :
                                          :
**APPLE DEVELOPMENT  SERVICES CORP.**     :
**19 Bala Avenue**                        :
**Bala Cynwyd, PA**                       :
                                          :
**R.N.V.C., INC.**                        :
**2040 Street Road**                      :
**Bensalem Plaza, Suite 4A**              :
**Bensalem, PA   19020**                  :
                                          :
**JC REAL ESTATE INVESTMENTS, LLC**       :
**2332 E. Allegheny Avenue**              :
**Philadelphia, PA   19134**              :
                                          :
**NINE, LLC**                             :
**2332 E. Allegheny**                     :
**Philadelphia, PA   19134**              :
                                          :
**TEN INVESTMENTS, LLC**                  :
**2332 E. Allegheny Avenue**              :
**Philadelphia, PA   19134**              :
                                          :

**ROBERT N. COYLE, SR. & SONS**        :
    **REAL ESTATE, INC**.             :
**2332 E. Allegheny Avenue**         :
**Philadelphia, PA   19134**          :
                                         :
**MEMORY LLC**                   :
**2332 E. Allegheny Avenue**         :
**Philadelphia, PA   19134**          :
                                         :
**LVJ, LLC**                       :
**27 Wiltshire Drive**               :
**Sewell, NJ  08080**                :
                                         :
                           **Defendants.**      :
_____ :

## C O M P L A I N T

Plaintiff John Tordini ("Plaintiff Tordini") <u>individually</u> seeks compensatory and punitive damages, attorneys fees and costs arising from the fraudulent inducement of his purchase of securities in Our Turn, LLC, a Pennsylvania limited liability company ("Our Turn").

Plaintiff Tordini, <u>derivatively</u> on behalf of Our Turn, also seeks compensatory and punitive damages, attorneys' fees and costs, arising from systematic and ongoing fiduciary misconduct destroying the value of Derivative Plaintiff Our Turn.  Defendants Robert N. Coyle, Sr., his wife, Carol Coyle, and their children, Vernon Coyle, Linda Coyle Price, and R.N.C. Investments LLC and The Coyle Family Irrevocable Trust (collectively, "the Coyle Family Defendants"), breached, and with their long-term accountant Defendant Bruce Bryen, CPA and his accounting firm, Defendant Bryen & Bryen (collectively, "Bryen Defendants") conspired to breach, fiduciary duties owed to Derivative Plaintiff Our Turn.

The Coyle Family Defendants, in concert with the Bryen Defendants, <u>inter</u> <u>alia</u>, steal millions of dollars through fraudulently induced loans secured by real property and then fraudulently convey the loan proceeds into alter ego shell companies owned by the Coyle Family Defendants,

including Defendants Landvest I; Landvest II ; Landvest III; O'tay; Alivest; Apple Development Services Corp.; R.N.V.C., Inc., JC Real Estate Investments; Nine; Ten; Robert N. Coyle Sr. & Sons Real Estate, Inc.; Memory and LVJ (collectively, "alter ego shell companies"). See Chart, p. 29, *infra.*

The plead pattern of fraudulent financial and fiduciary misconduct as set forth herein is only the tip of the iceberg. Discovery will confirm an even more extensive pattern of misconduct which has victimized Plaintiff Tordini, Derivative Plaintiff Our Turn, federally insured banks, the Internal Revenue Service ("IRS"), the Commonwealth of Pennsylvania, the City of Philadelphia, federal, state and local taxing agencies, labor enforcement authorities, and others.

## NATURE OF ACTION

1.     Beginning in 1997, Defendants Robert N. Coyle, Sr. ("Defendant Robert N. Coyle"), the Coyle Family Defendants, and the Bryen Defendants created and misrepresented the financial condition of the alter ego shell companies, and others to be discovered in an ongoing scheme, to illegally enrich the Coyle Family Defendants with millions of dollars in fraudulently induced loans, the vast majority of which they can never, and to not intend to, repay in full.

2.     As the initial step in this corrupt scheme, the Coyle Family Defendants and the Bryen Defendants purchase and quickly refinance properties principally in the Kensington and Port Richmond sections of Philadelphia, based on phony appraisals and fraudulent financial statements of Defendants Robert N. and Carol Coyle, as prepared by the Bryen Defendants.

3.     These fraudulent financial statements represent that over ninety percent (90%) of Defendants Robert N. and Carol Coyle's financial worth is based upon their ownership interests in, inter alia, the alter ego shell companies which grossly misrepresent profits in owning and

4

renting the real estate in the Kensington and Port Richmond sections of Philadelphia. See Chart, p. 29, *infra* and ¶¶ 75-86, *infra*.

4.      Then, relying on the fraudulent appraisals and financial statements, a series of banks lent over $10,000,000 to the alter ego shell companies controlled by the Coyle Family Defendants. See ¶¶ 69-72, *infra.*

5.      The Coyle Family Defendants secure this borrowing by: mortgages on properties allegedly owned by the alter ego shell company which they designate as the borrower; the personal guaranty of Defendants Robert N. and Carol Coyle based on their fraudulent financial statements; and, cross-collateralization and cross-default conditions in their loans so that all loans guaranteed by them will be in default if any other alter ego shell company defaults. See ¶¶ 69-74, *infra.* Thus, all loans are interrelated.

6.      The Coyle Family Defendants and the Bryen Defendants then fraudulently convey millions of dollars of the fraudulently induced loan proceeds from the borrower alter ego shell company to one or more of the Coyle Family Defendants directly. See Chart, p. 29, *infra* and ¶¶ 87-88.

7.      Since the mortgaged properties do not generate rental income sufficient to support the bank loans fraudulently induced by false financial statements and inflated appraised values, the Coyle Family Defendants and the Bryen Defendants transfer the fraudulently induced loan proceeds among the alter ego shell companies to keep the loans current, and continue their Ponzi scheme.

8.      They fraudulently convey mortgaged properties among the alter ego shell companies for millions of dollars to create phony paper profits, and then, through the Bryen Defendants, fraudulently misrepresent the allocation of these phony paper profits through the

payment of "management" or "administrative" "fees" between and among the alter ego shell companies.

9.    As a result, each alter ego shell company misrepresents a profit, although they are losing money.  See ¶¶ 80-82, *infra.*

10.    Fraudulently induced loan proceeds are eventually paid to the Coyle Family Defendants and then hidden away with non-borrowers R.N.C. Investments and the Coyle Family Trust to shelter any recovery of the fraudulently induced loan proceeds from the lenders, the Internal Revenue Service, and, the City of Philadelphia. See Chart, p. 29, *infra.*

11.    By fraudulently conveying the mortgaged properties among the alter ego shell companies, and related parties, for little or no consideration without disclosure or payoff to the secured banks, the Coyle Family Defendants and Bryen Defendants can simultaneously mortgage the same property to different banks to obtain additional loan proceeds, to again fuel their Ponzi scheme. See ¶¶ 89-103, 158-172, *infra.*

12.    To further implement their fraudulent financial scheme, the Coyle Family Defendants decided to have their own title insurance company issue fraudulent title insurance policies representing clear title on the same property to different banks. This scheme obtained loans based on mortgages secretly given to different banks collateralized by the same properties and fraudulently insured by a captive title insurance company.  See ¶¶ 159-172, *infra.*

13.    To effectuate their fraudulent scheme through ownership of a title insurance company, the Coyle Family Defendants, through their authorized agent, Defendant Robert N. Coyle, solicited Plaintiff Tordini, a Philadelphia banking executive, to leave his employment with Sun Bank, and become a 25% owner, President and Chief Operating Officer of Derivative Plaintiff Our Turn.

6

14.    Defendant Robert N. Coyle represented to Plaintiff Tordini that Defendant Our Turn would provide complete real estate and financial services, including, inter alia, title insurance, appraisal services, casualty insurance, loan brokerage and real estate brokerage.

15.    However, the Coyle Family Defendants, through Robert N. Coyle, and the Bryen Defendants, misrepresented, and failed to disclose to Plaintiff Tordini, the true financial condition of the Coyle Family Defendants' alter ego shell companies, and their real reason for purchasing Derivative Plaintiff Our Turn, namely as a vehicle to implement Defendants' pattern of fraudulent financial misconduct, as set forth herein.

16.    On November 22, 2000, the Coyle Family Defendants' financial statements fraudulently induced a $1,000,000 loan for their new alter ego company, Defendant O'tay, LLC, and a $500,000 loan for Our Turn's acquisition of Savings Abstract Company.

17.    Both loans were guaranteed by Defendants Robert N. and Carol Coyle, and further secured by mortgages on several properties owned by one or more of the alter ego Defendant companies controlled by the Coyle Family Defendants.

18.    The Coyle Family Defendants had these properties fraudulently appraised by, among other insiders, appraiser Lou Delloso, who was not independent, and had several business relationships with the Coyle Family Defendants, including owing money to them. See Chart, pp. 22-23, infra.

19.    However, the Coyle Family Defendants never disclosed to Plaintiff, or lenders, that their personal and business financial statements created by them and the Bryen Defendants submitted to induce the Our Turn loan, and millions of dollars in other Coyle Family Defendants' loans, were fraudulent, including, inter alia, the guaranty of Defendants Robert N. and Carol Coyle.

20.    On November 22, 2000, induced by Coyle Family Defendants' and the Bryen Defendants' fraudulent misrepresentations and material omissions, as alleged herein, Plaintiff Tordini purchased a twenty-five percent (25%) ownership interest in Our Turn by, inter alia, agreeing to leave his executive banking position to become the first President and Chief Operating Officer ("COO") of Our Turn.

21.    The Coyle Family Defendants and the Bryen Defendants failed to disclose, or otherwise concealed, in selling Our Turn securities to Plaintiff Tordini that their real purpose in inducing Plaintiff to purchase ownership in Our Turn was to provide financial experience and credibility to Our Turn, the licensed title insurance company through which the Coyle Family Defendants intended to implement their pattern of fraudulent, self-dealing transactions including, inter alia, their scheme to fraudulently induce bank loans, and then fraudulently convey these funds and the properties into the "judgment-proof" alter ego shell companies owned and controlled by the Coyle Family Defendants.

22.    After fraudulently inducing Plaintiff Tordini to purchase securities in Our Turn, the Coyle Family Defendants, in accordance with their previously undisclosed scheme, repeatedly breached fiduciary duties owed to Derivative Plaintiff Our Turn, thereby destroying its value, and benefitting the Defendants.

23.    As plead throughout, the Coyle Family Defendants and the Bryen Defendants conspired to breach fiduciary duties owed by the Coyle Family Defendants to Our Turn.

24.    Having fraudulently induced Plaintiff Tordini to purchase securities in Our Turn, the Coyle Family Defendants, in accordance with their previously undisclosed scheme, repeatedly breached fiduciary duties owed to Our Turn to diminish its value, and benefit the Coyle Family Defendants and the Bryen Defendants by, inter alia, directing Our Turn to "loan" or pay tens of

thousands of dollars of "consulting" or "administrative" fees to the Coyle Family Defendants, and their alter ego shell companies identified herein, as Defendants without business purpose, collateral, or documentation.

25.    Having fraudulently induced both Plaintiff Tordini and lenders to Derivative Plaintiff Our Turn, the Coyle Family Defendants, in accordance with their previously undisclosed scheme, repeatedly breached fiduciary duties owed to Derivative Plaintiff Our Turn to diminish its value, and to benefit the Defendants by, inter alia, paying over $26,000 to Defendant Bruce Bryen CPA individually on November 22, 2000, and an additional $25,000 to the Bryen Defendants for "services" that were not performed for Our Turn.

26.    Having fraudulently induced both Plaintiff Tordini to Derivative Plaintiff Our Turn, the Coyle Family Defendants, in accordance with their previously undisclosed fraudulent financial scheme, repeatedly breached fiduciary duties owed to Derivative Plaintiff Our Turn to diminish its value, and to benefit the Defendants by, inter alia, directing Derivative Plaintiff Our Turn to pay for phony "services" never provided by the Coyle Family Defendants or the Bryen Defendants, and to pay the legal bills and other expenses of their friends and affiliates, thus diverting funds away from Derivative Plaintiff Our Turn.

27.    Having fraudulently induced both Plaintiff Tordini and lenders to Derivative Plaintiff Our Turn, the Coyle Family Defendants, in accordance with their previously undisclosed scheme, repeatedly breached fiduciary duties owed to Derivative Plaintiff Our Turn to diminish its value, and to benefit the Defendants by, inter alia, diverting business opportunities and assets to themselves and the alter ego shell companies controlled by the Coyle Family Defendants, their affiliates, and those acting in concert with them, including re.com real estate.

28.     Having fraudulently induced Plaintiff Tordini to Derivative Plaintiff Our Turn, the Coyle Family Defendants, in accordance with their previously undisclosed scheme, repeatedly breached fiduciary duties owed to Our Turn to diminish its value, and to benefit the Defendants by, inter alia, directing Derivative Plaintiff Our Turn to pay the associates and friends of the Coyle Family Defendants "under the table" without withholding taxes. At least one of these persons, Denise Kenegy, was also fraudulently inducing unemployment compensation from the Pennsylvania Unemployment Compensation Fund.

29.     Having fraudulently induced both Plaintiff Tordini and lenders to Derivative Plaintiff Our Turn, the Coyle Family Defendants, in accordance with their previously undisclosed scheme, repeatedly breached fiduciary duties owed to Our Turn to diminish its value, and to benefit the Coyle Family Defendants by, inter alia,  on September 14, 2001, on the very same day that the Coyle Family Defendants terminated Plaintiff Tordini as President of Our Turn, abusing Derivative Plaintiff Our Turn's regulated status by submitting false title insurance policies to different lenders for the same property to fraudulently induce loans.  The Coyle Family Defendants, in conspiracy with the Bryen Defendants, then transferred these fraudulently induced loan proceeds to themselves.

30.     After Plaintiff Tordini discovered, and objected to, the Coyle Family Defendants' pattern of fiduciary and fraudulent misconduct, they, and those acting in concert with them, "lost" Plaintiff Tordini's files at Our Turn to cover up their ongoing misconduct and these records have never been returned to him.

31.     The Coyle Family Defendants' illegal misconduct and self-dealing, in conspiracy with the financial expertise of the Bryen Defendants, created a frenzy of fraud to fuel a Ponzi scheme of converting Derivative Plaintiff Our Turn's assets, and its present and prospective business opportunities, with the intent to divert Our Turn's assets solely to the Coyle Family Defendants, and

10

use its positive cash flow to fund the failing alter ego shell companies to perpetrate the Ponzi scheme.

32.     Unless Defendants' misconduct is preliminarily and permanently enjoined with a court ordered constructive trust and a receiver over Derivative Plaintiff Our Turn, the Coyle Family Defendants and the Bryen Defendants will continue to fraudulently convey Our Turn's profits and corporate opportunities to the Coyle Family Defendants personally, and to fuel the Ponzi scheme with payments of management fees and administrative fees, thus leaving Our Turn with diminished assets , limited liquidity, and minimum or no value.

33.     As a direct and proximate result of their plead fraudulent, fiduciary and tortious misconduct, Plaintiff is entitled to: compensatory and punitive damages against the Coyle Family Defendants and the Bryen Defendants arising from violating, and agreeing to violate, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)-5 issued thereunder; compensatory and punitive damages against the Coyle Family Defendants and the Bryen Defendants arising from making, and agreeing to make, fraudulent misrepresentations and material nondisclosures to induce the sale of Derivative Plaintiff Our Turn securities to Plaintiff Tordini; compensatory and punitive damages against the Coyle Family Defendants for negligent misrepresentation; compensatory and punitive damages, derivatively on behalf of Our Turn, LLC, against the Coyle Family Defendants, and the Bryen Defendants arising from their breaches, and agreement to breach, fiduciary duties owed as control persons of Derivative Plaintiff Our Turn; an accounting of all transactions, between and among the Defendants from June 1, 2000 to the present; following a full accounting of all transactions between and among Defendants, the entry of a constructive trust, appointment of a receiver *pendente lite*, and an order of disgorgement against all Defendants relating to all funds they have received which affect the financial statements

11

supporting loans for Derivative Plaintiff Our Turn, and by improperly using Derivative Plaintiff Our Turn to implement their fraudulent schemes; and preliminary and permanent injunctive relief to enjoin the further fraudulent transfers of funds and mortgaged properties affecting the collateral for the Our Turn loans and its assets.

## PARTIES

34.    Plaintiff Tordini, a citizen of Philadelphia, Pennsylvania, has a 25% equity ownership interest in Derivative Plaintiff Our Turn, LLC.

35.    Plaintiff brings this action individually for fraudulent inducement of his membership interests in Derivative Plaintiff Our Turn, and derivatively on behalf of Our Turn, seeking damages arising from the Coyle Family Defendants' joint several breaches of fiduciary duty and other tortious misconduct against it, in conspiracy with the Bryen Defendants, as defined herein.

36.    This action is brought, in part, derivatively by Plaintiff, who owns an equity interest in Derivative Plaintiff Our Turn, and has standing to bring this derivative action. Any demand upon the Coyle Family Defendants to commence an action against themselves, their shell alter ego companies and the Bryen Defendants who implemented, sheltered and concealed the pattern of fraudulent misconduct, would be futile.

37.    Derivative Plaintiff Our Turn, LLC ("Our Turn"), d/b/a Savings Abstract, is a Pennsylvania limited liability company formed in 2000, with its principal place of business in Jenkintown, Pennsylvania.

38.    Defendant Robert N. Coyle, Sr. ("Defendant Robert N. Coyle") is a citizen of the State of New Jersey, with his principal place of business in Philadelphia, Pennsylvania.

Defendant Robert Coyle admits being the "operating manager" of the alter ego shell companies named as Defendants herein.

39.     Defendant Robert N. Coyle owns and/or controls the alter ego shell companies created by him and the Bryen Defendants to further Defendants' fraudulent financial schemes. As set forth herein, he and the Defendants have received millions of dollars from the fraudulent schemes set forth herein.

40.     Defendant Carol Coyle is an adult individual and citizen of the State of New Jersey.  She is the majority owner of most of the Coyle Family Defendants' alter ego shell companies. As set forth herein, Defendant Carol Coyle has received hundreds of thousands of dollars from Defendants' ongoing fraudulent schemes.

41.     Defendant Vernon Coyle, an adult individual and citizen of the State of New Jersey, is a son of Defendants Robert N. and Carol Coyle.  He received hundreds of thousands of dollars from this fraudulent financial scheme; is an owner of many of the Coyle Family alter ego shell businesses; and, is currently a "consultant" to Our Turn.

42.     Defendant Linda Coyle Price is an adult individual and citizen of the Commonwealth of Pennsylvania, and a daughter of Defendants Robert N. and Carol Coyle.  She has received tens of thousands of dollars from Defendants' scheme of fraudulent and fiduciary misconduct.

43.     Defendant Coyle Family Irrevocable Trust ("Coyle Family Trust") was formed on November 23, 1999, by the Coyle Family Defendants with its principal place of business in the State of New Jersey. It has received millions of dollars from Defendants' fraudulent scheme as set forth herein.  See Chart, p. 29 and ¶¶ 87-88, *infra*.

44.    Defendant R.N.C. Investments, LLC a/k/a R.N.C. Investments, LLC ("R.N.C. Investments") is a New Jersey limited liability company formed on September 6, 2000.  It is a successor and/or affiliate of RNC Investments LLC, a Pennsylvania limited liability company formed on May 19, 1999 and dissolved on November 16, 2001. R.N.C. Investments is allegedly the majority owner of Our Turn's equity interests and, through the other Coyle Family Defendants, acts as its control person. It was formed for the purpose of acquiring assets and holding them for the preservation of the heirs of Robert and Carol Coyle.  It is owned 1% each by Defendants Robert N. and Carol Coyle, and 98% by The Coyle Family Trust. Defendant R.N.C. Investments has received millions of dollars through Defendants' fraudulent financial schemes. See Chart, p. 29 and ¶¶ 87-88, infra.

45.    Defendant Bruce Bryen, CPA ("CPA Bryen") is a licensed certified public accountant with his citizenship and principal place of business with Defendant Bryen & Bryen located in the State of New Jersey.   The Coyle Family Defendants characterize CPA Bryen as their "personal advisor".  CPA Bryen acts, at all times, as the authorized agent for his accounting firm, Defendant Bryen & Bryen.

46.    Defendant Bryen & Bryen is a New Jersey accounting firm controlled by Defendant CPA Bryen and licensed to provide accounting services in New Jersey, where it maintains it principal place of business. They are collectively referred to herein as "the Bryen Defendants".   As set forth herein, the Bryen Defendants have received tens of thousands of dollars through Defendants' fraudulent and fiduciary misconduct.

47.    Defendant Landvest LLP ("Landvest I") is a Pennsylvania limited liability partnership formed on November 5, 1997, with its current place of business at 2332 E. Allegheny Avenue, Philadelphia, Pennsylvania.  Defendants Carol Coyle, Vernon Coyle and

Robert N. Coyle own Defendant Landvest I. As set forth herein, it has received hundreds of thousands of dollars through the Coyle Family Defendants and Bryen Defendants' fraudulent and fiduciary misconduct.

48.    Defendant Landvest/LLP II ("Landvest II") is a Pennsylvania limited liability partnership formed on January 5, 1998 in Pennsylvania, with its current place of business at 2332 E. Allegheny Avenue, Philadelphia, Pennsylvania. Defendants Carol Coyle, Vernon Coyle and Robert N. Coyle own Defendant Landvest II. As set forth herein, it has received hundreds of thousands of dollars through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

49.    Defendant Landvest/LLP III  ("Landvest III") is a Pennsylvania limited liability partnership formed on January 5, 1998, with its current place of business at 2332 E. Allegheny Avenue, Philadelphia, Pennsylvania. Defendants Carol Coyle Vernon Coyle and Robert N. Coyle own Defendant Landvest III.   As set forth herein, it has received in excess of $1,000,000 through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

50.    Defendant O'tay, LLC ("O'tay") is one of the alter ego shell companies and is a Pennsylvania limited liability company formed on June 16, 2000, with its current place of business at 2332 E. Allegheny Avenue, Philadelphia, Pennsylvania. O'tay is a racially prejudiced reference to a fictional character from the 1930's. As with the other Coyle Family Defendants' alter ego shell companies, O'tay's purpose was to acquire real estate properties principally in the Kensington and Port Richmond sections of Philadelphia. Defendants Carol Coyle, Vernon Coyle and Robert N. Coyle own Defendant O'tay. Defendant Robert N. Coyle is its Chief Executive Officer. As set forth herein, Defendant O'tay has received in excess of

$1,000,000 through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

51.    Defendant Alivest LLP ("Alivest") is a Pennsylvania limited liability partnership formed on January 27, 1999 with its current place of business at 2332 E. Allegheny Avenue, Philadelphia, Pennsylvania. Defendant Alivest is owned by Defendants Carol Coyle, Vernon Coyle and Robert N. Coyle. As set forth herein, it has received in excess of $1,000,000 through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

52.    Defendant Apple Development Corporation ("Apple Development") is a Pennsylvania corporation, with its principal place of business in Bala Cynwyd, Pennsylvania. Defendant Apple Development is owned 100% by Defendant Carol Coyle.  Defendant Robert N. Coyle is the "Operating Manager" of Defendant Apple Development. As set forth herein, it has received in excess of $1,900,000 through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

53.    Defendant R.N.V.C., Inc. ("RNVC") is a corporation formed on December 21, 1998, with its principal place of business in Bensalem, Pennsylvania.  Defendant Robert N. Coyle is the Chief Executive Officer, Vice President, Treasurer and Secretary of RNVC. As set forth herein, it has received tens of thousands of dollars through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

54.    Defendant JC Real Estate Investments, LLC ("JC Real Estate") is a Pennsylvania limited liability company formed on June 23, 1999.  It is owned by Defendants Robert N. Coyle, Carol Coyle, Vernon Coyle and Linda Coyle Price. Defendant Robert N. Coyle is its Chief Executive Officer and Operating Manager. As set forth herein, Defendant JC Real Estate has received over $1,000,000 in fraudulently induced loan proceeds from banks.

16

55.     Defendant Nine, LLC is a Pennsylvania limited liability company formed on November 12, 1999 in Pennsylvania with its place of business at 2332 E. Allegheny Avenue, Philadelphia, Pennsylvania. Defendants Carol Coyle, Vernon Coyle and Robert N. Coyle own it. Defendant Robert N. Coyle is its Chief Executive Officer. Defendant Vernon Coyle is its Vice President, and Defendant Linda Coyle Price is its Secretary. As set forth herein, it has received in excess of $1,000,000 through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

56.     Defendant Ten Investments LLC ("Ten Investments") is a Pennsylvania limited liability company formed on December 13, 2000 with its principal place of business at 2332 E. Allegheny Avenue, Philadelphia. Defendant Vernon Coyle is its Chief Executive Officer, Defendant Carol Coyle is its Vice President, and Defendant Robert N. Coyle is its Secretary. As set forth herein, it has received over a $1,000,000 through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

57.     Defendant Robert N. Coyle & Sons Real Estate, Inc. is a Pennsylvania corporation with its principal place of business at 2332 E. Allegheny Avenue, Philadelphia. Defendant Robert N. Coyle is its chief executive officer. As set forth herein, it has received tens of thousands of dollars through the Coyle Family Defendants' and Bryen Defendants' fraudulent and fiduciary misconduct.

58.     Defendant Memory LLC is a Pennsylvania limited liability company formed on September 19, 2001 with its principal place of business at 2332 E. Allegheny Avenue, Philadelphia. Upon information and belief, Defendants formed Memory LLC as another alter ego shell company to further their fraudulent financial schemes set forth herein.

17

59.    Defendant LVJ, LLC ("LVJ") is a New Jersey limited liability company formed in April 2001 with its principal place of business at 27 Wiltshire Drive, Sewell, New Jersey. Defendant Vernon Coyle is the registered agent for LVJ.   Upon information and belief, Defendants formed LVJ as another alter ego shell company to further their fraudulent financial schemes set forth herein.

60.    Plaintiff Tordini reserves the right after discovery to amend this Complaint to further identify Defendants' fraudulent misconduct that damages him, Derivative Plaintiff Our Turn (d/b/a Savings Abstract), banks, the  Internal Revenue Service, the City of Philadelphia, the Commonwealth of Pennsylvania, state and local governmental entities, and others.

### JURISDICTION AND VENUE

61.    Count I of this Complaint arises under §10b of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78(b) and, under Rule 10b-5, 17 C.F.R. §240.10(b)-5.

62.    This Court has jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78AA, pursuant to 28 U.S.C. §1331 and under the principles of supplemental jurisdiction, 28 U.S.C. §1367(a).

63.    Venue is proper in this Court pursuant to §27 of the Exchange Act, 15 U.S.C. §78AA and 28 U.S.C. §1391.

64.    Defendants' unlawful acts in furtherance of their scheme to defraud Plaintiff and destroy Our Turn through fraudulent and tortious misconduct occurred in the Eastern District of Pennsylvania.

### FACTUAL BACKGROUND COMMON TO ALL CLAIMS

**A.    Defendants' Ongoing Scheme Fraudulently Conveys Millions Of Dollars Of Loan Proceeds To The Coyle Family Defendants.**

a.    **The Coyle Family Defendants Contrive Fraudulent Appraisals To Induce Loans.**

65.    Shortly after purchasing properties, the Coyle Family Defendants quickly obtain phony appraisals reporting inflated values three to four times the purchase price and submitted them to banks. **For example**:

| LANDVEST I & II<br>FIRST REPUBLIC BANK | Date Of<br>Purchase | Purchase<br>Price | 1/99 Appraisal<br>Value |
|---|---|---|---|
| 1811 E. TIOGA ST. | 11/07/97 | $15,000 | $42,000 |
| 615 E. THAYER ST. | 04/30/98 | 12,000 | 42,000 |
| 3088 HELEN ST. | 05/15/98 | 16,000 | 42,000 |
| 3403 TAMPA ST. | 05/22/98 | 15,000 | 42,000 |
| 3159 CUSTER ST. | 06/05/98 | 15,000 | 42,000 |
| 2077 E.LIPPINCOTT ST. | 07/02/98 | 17,300 | 42,000 |
| 1945 E. THAYER ST. | 07/15/98 | 17,500 | 42,000 |
| 3306 N. LEE ST. | 07/15/98 | 16,000 | 42,000 |
| 3136 "E" ST. | 06/05/98 | 18,000 | 42,000 |
| 3340 AMBER ST. | 06/26/98 | 17,000 | 42,000 |
| 745 E. ONTARIO ST. | 06/10/98 | 21,000 | 42,000 |
| 1913 E. ONTARIO ST. | 06/30/98 | 18,000 | 42,000 |
| 1921 E. TIOGA ST. | 06/02/98 | 19,700 | 42,000 |
| 3502 SHELBORNE ST. | 06/15/98 | 17,700 | 42,000 |
| 4607 HURLEY ST. | 6/30/98 | 20,000 | 65,000 |
| 1859 E. LIPPINCOTT ST. | 06/30/98 | 16,000 | 42,000 |
| 3241 TAMPA ST. | 07/15/98 | 17,000 | 42,000 |
| 1852 CLARENCE ST. | 07/15/98 | 18,000 | 42,000 |
| 218 E. CAMBRIA ST. | 07/10/98 | 17,000 | 42,000 |
| 1911 E. BIRCH ST. | 07/31/98 | 18,000 | 42,000 |
| 3125 JANNEY ST. | 07/24/98 | 18,500 | 42,000 |
| 1835 E. WESTMORLAND ST. | 07/23/98 | 18,000 | 42,000 |
| 2533 E. DAKOTA ST. | 07/15/98 | 25,000 | 50,000 |
| 2020 BUCKIUS ST. | 06/30/98 | 22,700 | 50,000 |
| 1935 E. WENSLEY ST. | 08/07/98 | 19,000 | 42,000 |
| 4219 GRISCOM ST. | 06/11/98 | 23,000 | 50,000 |
| 2961 "D" ST. | 07/05/98 | 16,700 | 42,000 |
| 3532 STOUGHTON ST. | 08/07/98 | 15,000 | 42,000 |
| 3310 ARGYLE ST. | 07/23/98 | 18,000 | 42,000 |
| 2038 BUCKIUS ST. | 07/06/98 | 22,800 | 50,000 |
| 2042 E. WILLARD ST. | 07/05/98 | 15,900 | 42,000 |
| 1823 E.CLEARFIELD ST. | 06/30/98 | 17,000 | 42,000 |

| | | | |
|---|---|---|---|
| 1817 E. WENSLEY ST. | 06/30/98 | 18,000 | 42,000 |
| 1859 E. CORNWALL ST. | 06/10/98 | 18,000 | 42,000 |
| | | **$608,800** | **$1,483,000** |

| **LANDVEST III** | Date Of | Purchase | 1/99 Appraisal |
|---|---|---|---|
| **REPUBLIC BANK** | Purchase | Price | Value |
| | 04/24/98 | | |
| 757 E. MADISON ST. | | $15,000 | $43,000 |
| 3163 AGATE ST. | 09/18/98 | 15,000 | 43,000 |
| 2028 E. YORK ST. | 09/25/98 | 15,000 | 65,000 |
| 3503 SHELBORNE ST. | 09/29/98 | 20,000 | 43,000 |
| 1919 BIRCH ST. | 09/30/98 | 18,000 | 43,000 |
| 3430 "H"ST. | 09/30/98 | 17,500 | 43,000 |
| 1928 E. LIPPINCOTT ST. | 09/30/98 | 17,000 | 43,000 |
| 1862 E. SCHILLER ST. | 09/30/98 | 16,000 | 43,000 |
| 1917 BIRCH ST. | 10/05/98 | 17,000 | 43,000 |
| 3358 "A" ST. | 10/15/98 | 5,000 | 43,000 |
| 726 E. MADISON ST. | 10/15/98 | 9,500 | 43,000 |
| 753 E. THAYER ST. | 10/21/98 | 14,000 | 43,000 |
| 2009 HART ST. | 11/16/98 | 19,000 | 43,000 |
| 930 E. RUSSELL ST. | 11/16/98 | 20,000 | 43,000 |
| 2227 ANN ST. | 11/23/98 | 18,000 | 43,000 |
| 2080 E. LIPPINCOTT ST. | 11/30/98 | 19,000 | 43,000 |
| 3222 HURLEY ST. | 11/30/98 | 19,000 | 43,000 |
| 3009 ARAMINGO ST | 11/30/98 | 28,000 | 43,000 |
| 1843 HART ST. | 12/18/98 | 18,000 | 43,000 |
| 3051 JANNEY ST. | 12/18/98 | 23,000 | 43,000 |
| 3148 "G" ST. | 12/18/98 | 18,000 | 43,000 |
| 3509 PENNHURST ST. | 12/23/98 | 19,000 | 43,000 |
| 4118 "M" ST. | 12/23/98 | 29,000 | 65,000 |
| 1821 HART LANE | 12/29/98 | 16,000 | 43,000 |
| 1823 HART LANE | 12/29/98 | 18,000 | 43,000 |
| 811 E. CORNWALL ST. | 12/30/98 | 20,000 | 43,000 |
| 3065 TULIP ST. | 12/30/98 | 28,000 | 43,000 |
| 1838 E. THAYER ST. | 12/29/98 | 20,000 | 43,000 |
| 1817 E. LIPPINCOTT ST. | 12/30/98 | 20,000 | 43,000 |
| 1920 HART ST. | 12/21/98 | 18,000 | 43,000 |
| 3506 SHELBORNE ST. | 12/29/98 | 18,000 | 43,000 |
| 34 N. LINDENWOOD ST. | 12/18/98 | 19,000 | 45,000 |
| 609 N. WILTON ST. | 12/18/98 | 18,000 | 45,000 |
| | | **$604,000** | **$1,467,000** |

| TEN INVESTMENTS, LLC. | Purchase Price | 8/01 Appraisal Value |
|---|---|---|
| 1911 E. THAYER ST. | $14,000 | $55,000 |
| 2007 E. ALLEGHENY | 30,000 | 110,000 |
| 1904 N. HOWARD | 18,000 | 60,000 |
| 3509 N. LEE ST. | 2,800 | 50,000 |
| 3272 JOYCE ST. | | 55,000 |
| 4152 DARIEN ST. | 10,500 | 50,000 |
| 4047 DUNGAN ST. | 10,500 | 70,000 |
| 4049 DUNGAN ST. | 18,000 | 70,000 |
| 4622 WEYMOUTH ST. | 18,500 | 65,000 |
| 2526 EMERY ST. | | 65,000 |
| 5025 BOUDINOT ST. | 10,000 | 60,000 |
| 2709 E. ELKART ST. | 18,500 | 65,000 |
| 3224 E. ST. | 18,500 | 50,000 |
| 2515 ANN ST. | 19,500 | 65,000 |
| 3026 A ST. | 15,000 | 50,000 |
| 2033 MARTHA ST. | 15,000 | 65,000 |
| 3441 HURLEY ST. | 13,500 | 50,000 |
| 4284 GRISCOM ST. | 20,000 | 65,000 |
| 3023 JNNEY ST. | 19,000 | 65,000 |
| 2218 CEDAR ST. | 23,000 | 65,000 |
| 2910 ARAMINGO ST. | | 65,000 |
| 2324 ARNOLD ST. | 19,000 | 65,000 |
| 3442  E ST | | 50,000 |
| 3433 ARBOR ST | 18,000 | 50,000 |
| | | **$1,480,000** |

66.    By way of further example, the Coyle Family Defendants directed their insider appraiser Louis Delloso (t/a Town & Country Realty) ("Delloso") to fraudulently appraise twenty-seven (27) properties that were acquired by Defendants for $329,500, or approximately $12,000 each, at a total value of $1,474,700, or an average of approximately $54,600 per property.

67.    Appraiser Delloso is not independent, as he has several financial relationships with the Coyle Family Defendants, including owing money to Defendant RNC Investments.

68.    Appraiser Delloso agreed to provide fraudulent appraisals despite the fact that the average purchase price for these properties was approximately $12,000 per property. **For example**:

| O'tay | Purchase Price | Delloso's Fraudulent Appraisal |
|-------|---------------|-------------------------------|
| 3524 EMERALD ST. | $9,500 | $50,700 |
| 3343 ARGYLE ST. | 13,000 | 50,000 |
| 4940 GRANSBACK ST. | 20,000 | 56,500 |
| 2076 E. LIPPINCOTT ST. | 16,500 | 50,000 |
| 3549 EMERALD ST. | 15,000 | 50,500 |
| 1933 E. SOMERSET ST. | 13,000 | 49,900 |
| 3526 BRADDOCK ST. | 15,000 | 47,500 |
| 2081 E. ATLANTIC ST. | 10,500 | 55,000 |
| 3076 AGATE ST. | 9,500 | 63,000 |
| 3403 HARTVILLE ST. | 9,500 | 51,500 |
| 3166 AGATE ST. | 20,000 | 63,000 |
| 3161 AGATE ST. | 10,500 | 63,000 |
| 1820 E. COMWALL ST. | 10,500 | 52,000 |
| 3180 AGATE ST.  (R2) | 9,000 | 60,000 |
| 2072 E. ELKHART ST. | 11,000 | 51,500 |
| 1913 E. TIOGA ST. | 15,000 | 54,000 |
| 2979 MEMPHIS ST. | 14,000 | 67,000 |
| 633 E. CLEMENTINE ST. | 7,500 | 49,900 |
| 2036 E. CLEMENTINE ST. | 9,500 | 49,900 |
| 2948 RORER ST. | 14,000 | 51,500 |
| 3352 ELLA ST. | 9,500 | 51,000 |

22

| | | |
|---|---|---|
| 710 E. MADISON ST. | 15,000 | 53,000 |
| 2959 MEMPHIS ST. | 17,000 | 67,000 |
| 627 E. WENSLEY ST. | 12,000 | 51,400 |
| 2820 PALETHORP ST. | 4,000 | 49,900 |
| 3147 RORER ST. | 9,000 | 53,000 |
| | **$329,500** | **$1,474,700** |

        **b.**       **The Coyle Family Defendants And Bryen Defendants Fraudulently Induce Banks To Lend Over $10 Million To The Alter Ego Shell Companies Controlled By The Coyle Family Defendants.**

69.    Based on the fraudulent appraisals and financial statements identified herein, the Coyle Family Defendants fraudulently induced approximately $10,500,000 in loans from a series of banks which have, at times, employed a business associate of the Coyle Family Defendants, Carl Lingle, as a loan officer, including First Bank of Philadelphia, First Penn Bank and Sterling Bank.

70.    The Coyle Family Defendants, through the fraudulent appraisals and financial statements detailed herein, have fraudulently induced $3,500,000 in loans from First Republic Bank to Landvest I, Landvest II, Landvest III, O'tay, and Our Turn.

71.    Based on the fraudulent appraisals and financial statements identified herein alone, the Coyle Family Defendants induced approximately another $6,500,000 in loans from, inter alia, First Bank of Philadelphia ($160,000); Third Federal Savings ($300,000); Wilmington Trust ($63,000); Alliance Bank ($3,250,000); Sun National Bank ($2,000,000); Equity One ($260,000); and, First Penn Bank ($537,000).

72.    The Coyle Family Defendants fraudulently induced over $10,000,000 in loans for their alter ego shell companies, including Defendant Apple Development, Defendant Alivest, Defendant JC Real Estate, Defendant Landvest, Defendant Landvest II, Defendant Landvest III,

Defendant O'tay, Defendant Nine Investments, Defendant Ten Investments, and Derivative Plaintiff Our Turn.

73.     This scheme of fraudulent borrowing began in May 1997, and continues to date. Upon information and belief, these Defendant alter ego shell companies now owe approximately $9,500,000 in outstanding debt to banks.

74.     In exchange for these multi-million dollar loans, the banks received mortgages on the properties pledged by each Defendant alter ego shell company borrower, a guaranty from Defendant Robert N. and Carol Coyle and, a default provision that a default in any loan with the same bank or same collateral also constitutes a default in any other loan.  These are called "cross-default" or "cross-collateralization" provisions.  Thus, any default in payment from any of the Defendant alter ego shell companies will result in a default on a loan to another alter ego shell company, even if it is paying its loan on a current basis.

> **c.     The Defendants Fraudulently Convey The Loan Proceeds Among The Alter Ego Shell Companies And Re-Appraise The Mortgaged Properties Themselves To Lull The Banks.**

75.     The income from the mortgaged properties is mostly in the form of rental income from the real estate owned by one or more of the alter ego shell companies. It is insufficient to repay the principal, interest, operating expenses and real estate taxes to support the multi-million dollar loans induced by the Coyle Family Defendants' fraudulent appraisals and financial statements.

76.     However, the Coyle Family Defendants and the Bryen Defendants' fraudulent financial scheme lulls the banks, and avoids defaults by keeping loan payments current and providing phony "profitable" financial statements for the alter ego shell companies to support the

fraudulent value constituting over ninety percent (90%) of the Defendants Robert N. and Carol Coyle financial statement which is the basis of their guaranty to banks for each loan.

77.    As such, the Coyle Family Defendants, through Defendant Robert N. Coyle, and the Bryen Defendants, transfer just enough of fraudulent loan proceeds induced by the Defendant alter ego shell companies so that each of them can remain current on its loan which would otherwise be in default   Otherwise, one default will operate as a cross-default on millions of dollars in additional loans, and result in the failure of the Coyle Family Defendants' Ponzi scheme..

78.    To conceal these transfers of hundreds of thousands of dollars, the Bryen Defendants mischaracterize them as inter-company "administrative" or "consulting" "fees" on the financial statements of each alter ego shell company.

79.    As the intended result of the Coyle Family Defendants and the Bryen Defendants' fraudulent misconduct in mischaracterizing inter-company transfers,  each Defendant alter ego shell company shows a "paper" profit. However, each alter ego shell company fails to return a profit since each is dependent on rental income which can never support the mortgages, operational expenses and real estates taxes based upon the fraudulently inflated appraisals and financial statements.

80.    For example, in 2000 alone, several of the Defendant alter ego shell companies were generating negative cash flows:

| INCOME (in $,000s) | Apple | Alivest | JC | Land-Vest I | Land-Vest II | Land-Vest III | Nine | O'tay | Total Income |
|---|---|---|---|---|---|---|---|---|---|
| RENT | $259 | $133 | $211 | $150 | $123 | $159 | $97 | $10 | $1142 |
| INTEREST | 2 | 2 | 7 | 1 | 0 | 1 | 8 | 2 | 23 |
|  | 261 | 135 | 218 | 151 | 123 | 160 | 105 | 12 | 1165 |

25

**OPERATING EXPENSES**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ADVERTISING | 3 | 2 | 8 | 5 | 0 | 0 | 9 | 0 | 27 |
| BANK FEES | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| AUTO/TRAVEL | 0 | 0 | 9 | 20 | 0 | 0 | 31 | 0 | 60 |
| BUSINESS TAXES | 5 | 0 | 0 | 0 | 3 | 2 | 0 | 0 | 10 |
| CREDIT REPORTS | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| DEED RECORDING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EVICTION SERVICES | 11 | 3 | 3 | 6 | 5 | 6 | 2 | 0 | 36 |
| INSURANCE | 23 | 15 | 6 | 9 | 0 | 0 | 66 | 24 | 143 |
| INTEREST | 176 | 89 | 90 | 82 | 79 | 85 | 72 | 5 | 678 |
| PROFESSIONAL FEES | 9 | 6 | 13 | 15 | 0 | 0 | 37 | 0 | 80 |
| LICENSES/PERMITS | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 3 |
| MAINT./REPAIRS | 0 | 1 | 0 | 44 | 1 | 4 | 39 | 2 | 91 |
| MEALSNTERTAINMENT | 2 | 0 | 2 | 3 | 0 | 0 | 10 | 0 | 17 |
| MISC. /OFFICE | 2 | 2 | 7 | 7 | 0 | 1 | 8 | 0 | 27 |
| RENT EXPENSE | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 |
| TELEPHONE | 0 | 0 | 3 | 3 | 0 | 0 | 5 | 0 | 11 |
| REAL ESTATE TAXES | 6 | 0 | 2 | 12 | 0 | 0 | 63 | 13 | 96 |
| SUBCONTRACTORS | 0 | 26 | 19 | 5 | 0 | 0 | 11 | 15 | 76 |
| UTILITIES | 2 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 5 |
| | 258 | 144 | 164 | 213 | 88 | 100 | 354 | 59 | 1380 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **OPERATING CASH FLOW ($,000)** | **$3** | **$-9** | **$54** | **$-62** | **$35** | **$60** | **$-249** | **$-47** | **$-215** |

81.    In furtherance of this fraudulent financial scheme, the Bryen Defendants then actively misrepresented the actual financial condition of the alter ego shell companies by contriving hundreds of thousands of dollars in paper profits through inter-company sales of real estate.

82.    These phony "paper profits" were then allocated by the Bryen Defendants as "management" or "administrative" "fees" among the failing alter ego shell companies, and thus creating a fraudulent portrayal of a profitable operation for each alter ego shell company:

| | Apple | Alivest | JC | Land-Vest I | Land-Vest II | Land-Vest III | Nine | O'tay | Total |
|---|---|---|---|---|---|---|---|---|---|
| SALE OF PROPERTIES-GROSS | $825 | 0 | 0 | $182 | 0 | 0 | $42 | $13 | 1062 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LESS:PROPERTY DIRECT COST | -191 | 0 | 0 | -68 | 0 | 0 | | -259 |
| MANAGEMENT FEES | -350 | 0 | 0 | 715 | 0 | 0 | 0 | 0 | 365 |
| ADMINISTRATIVE FEES | -230 | 50 | 15 | -482 | 0 | 0 | 250 | 182 | -215 |
| GUARANTEED PAYMENTS | 0 | 0 | -30 | 0 | 0 | 0 | 0 | -55 | -85 |
| | 54 | 50 | -15 | 347 | 0 | 0 | 292 | 140 | 868 |
| | | | | | | | | | |
| EFFECTIVE CASH FLOW | 57 | 41 | 39 | 285 | 35 | 60 | 43 | 93 | 653 |
| | | | | | | | | | |
| **NON-CASH DEDUCTIONS** | | | | | | | | | |
| AMORTIZATION | 28 | 11 | 24 | 23 | 20 | 21 | 10 | 5 | 142 |
| DEPRECIATION | 3 | 2 | 3 | 1 | 2 | 2 | 2 | 0 | 15 |
| | 31 | 13 | 27 | 24 | 22 | 23 | 12 | 5 | 157 |
| | | | | | | | | | |
| **NET INCOME (LOSS) ($000)** | **$26** | **$28** | **$12** | **$261** | **$13** | **$37** | **$31** | **$88** | **$496** |

83.    To further contrive a profitable financial statement for each alter ego shell company, the Coyle Family Defendants fraudulently reassessed the property values themselves, so that the purported "equity" in each alter ego shell company as misrepresented by the Bryen Defendants is always sufficient to demonstrate financial strength for the alter ego shell company that owns that mortgaged property.

84.    The Coyle Family Defendants, claiming that they were not aware of the extent of these fraudulent financial statements, cannot deny that the Bryen Defendants created these financial statements.

85.    Over ninety percent (90%) of the multi-million net worth of Defendants Robert N. and Carol Coyle represented in their financial statements prepared by the Bryen Defendants, and provided by the Coyle Family Defendants and the Bryen Defendants to every lender in support of the millions of dollars in loans, is based upon Defendants Robert N. and Carol Coyle's controlling ownership interests in the alter ego shell companies; as set forth herein, all of these financial statements are false based on the scheme detailed herein.

86.    Accordingly, the guaranties of Robert N. and Carol Coyle are based on fraudulent financial statements prepared by the Bryen Defendants and their guarantees to the several banks are worthless.

        **d.**     **Millions Of Dollars In Loan Proceeds Are Fraudulently Conveyed Through The Coyle Family Defendants And To R.N.C. Investments And The Coyle Family Trust.**

87.    Defendants Robert N. and Carol Coyle's financial statements, prepared and disseminated by the Bryen Defendants, does not report the almost $4,000,000 in cash received by them as a result of the fraudulent financial scheme plead herein.  Indeed, the millions of dollars fraudulently conveyed to the Coyle Family Defendants are then fraudulently conveyed to Defendants Coyle Family Trust and RNC Investments.

88.    The Coyle Family Defendants, with the active direction and participation of the Bryen Defendants, fraudulently conveyed substantially in excess of four million dollars ($4,000,000.00) from lenders to themselves and eventually into Defendant RNC Investments and the Coyle Family Trust:



   e.    **The Coyle Family Defendants And Bryen Defendants Fraudulently Convey The Mortgaged Properties Without Disclosure Or Payoff To The Lenders Relying On These Mortgaged Properties As Collateral.**

89.    In addition to fraudulently conveying millions of dollars in loan proceeds to Defendants, the Coyle Family Defendants, at the direction of the Bryen Defendants, fraudulently conveyed mortgaged properties among the alter ego shell companies to allow additional alter ego shell companies controlled by the Coyle Family Defendants to fraudulently induce loans based on the same properties or collateral.

90.    Specifically, and only by way of one example of many yet to be discovered properties fraudulently conveyed by the Coyle Family Defendants, on December 29, 1998, the Coyle Family Defendants, through Defendant Landvest III, purchased 1821 and 1823 Hart Street, Philadelphia.

91.    The Coyle Family Defendants pledged 1821 and 1823 Hart Street as security for loans from First Republic Bank, including loans to Derivative Plaintiff Our Turn.

92.    On June 2, 1999, Defendant Landvest III transferred 1821 and 1823 Hart Street to a Luis Lopez, Jr., and misrepresented him as a "related party" (father or son) to further cheat the City of Philadelphia by avoiding paying transfer taxes on the sale of these two properties.

93.    This purported purchaser, Luis Lopez, Jr., listed his mailing address at a building owned by Defendant Robert N. Coyle, and which serves as the Coyle Family Defendants' principal business address.

94.    Without notice to their mortgagor on this property, First Republic Bank, the Coyle Family Defendants secretly and fraudulently transferred this property, which has been pledged as collateral to First Republic Bank.

95.    To date, First Republic Bank does not know that these two properties, which are collateral for the Our Turn loan, have been secretly transferred to Luis Lopez.

96.    By way of further example, in 1998, the Coyle Family Defendants, through Defendant Landvest I, borrowed $260,000 from Equity One, as secured by, inter alia, the guaranty of Defendants Robert N. and Carol Coyle, and mortgages on real property. However, the original Equity One mortgage was mysteriously never filed in Philadelphia County.

97.    In forming Defendant O'tay in June 2000, the Coyle Family Defendants transferred eight (8) properties owned by Landvest I, and already mortgaged to Equity One, to Defendant O'tay.

98.    The Coyle Family Defendants and the Bryen Defendants knew that the Equity One mortgages had not been filed in Philadelphia County.

99.    Defendant Landvest I, through its control persons the Coyle Family Defendants, never advised Equity One that it had sold its mortgaged properties to Defendant O'tay.

100.    To then fraudulently induce another loan based on the same collateral given to Equity One, and based upon Appraiser Delloso's fraudulent appraisals (see Chart pp. 22-23 and ¶¶ 66-68, *supra*.), the Coyle Family Defendants, in concert with Defendants Bryen, submitted a fraudulent loan request to First Republic Bank for an additional $1,000,000 loan to Defendant O'tay, to be secured by a first mortgage on twenty-seven (27) properties fraudulently conveyed by the Coyle Family Defendants to Defendant O'tay, including the eight (8) properties that had already been specifically mortgaged to Equity One.

101.    The Coyle Family Defendants and the Bryen Defendants did not disclose to First Republic Bank that several of these properties they were providing as collateral to First Republic

Bank had already been mortgaged with Equity One, and that these prior first mortgages were not satisfied.

102.    Settlement for the $1,000,000 First Republic Bank loan to Defendant O'tay was scheduled for November 22, 2000.

103.    Without any new properties to provide mortgage security for the O'tay loan, the Coyle Family Defendants now decided to provide the same collateral to two different lenders, and needed to find title insurance to further implement their pattern of fraudulent financial scams.

**B.    The Coyle Family Defendants And Bryen Defendants Fraudulently Induce Plaintiff Tordini To Purchase Securities In Our Turn.**

104.    Beginning in mid-2000, the Coyle Family Defendants and Bryen Defendants, through their fraudulent financial representations, solicited Plaintiff Tordini to leave his executive banking position to become an owner and operating manager of a title insurance company being formed by the Defendants, namely Derivative Plaintiff Our Turn, LLC, d/b/a Savings Abstract.

105.    The Coyle Family Defendants, through their agent, Defendant Robert N. Coyle, and the Bryen Defendants, represented to Plaintiff Tordini that Derivative Plaintiff Our Turn would be a full services financial company, providing title insurance, appraisals, casualty insurance, loan brokerage and real estate brokerage, and that he would be a twenty-five percent (25%) owner of Our Turn, in addition to receiving an executive position, benefits, and other perquisites, as subsequently set forth in a November 22, 2000 Operating Agreement and Employment Agreement.

106. To induce Plaintiff Tordini to leave his executive banking position and become an owner in Derivative Plaintiff Our Turn, the Coyle Family Defendants and Bryen Defendants prepared financial statements of RNC Investments and Defendants Robert N. and Carol Coyle, and gave them to Plaintiff Tordini to review.

107. These financial statements prepared by the Defendant Robert N. Coyle, the Coyle Family Defendants, and the Bryen Defendants to solicit Plaintiff Tordini's purchase of securities were materially false in several respects, as set forth herein, including, but not limited to, being based on: fraudulent appraisals by allegedly independent appraisers; fraudulent reassessments by the Coyle Family Defendants and Bryen Defendants to contrive a healthy financial picture for banks; fraudulent representations of "profits" in the alter ego shell companies, based upon payments of inter-company "management fees" and inter-company sales of the mortgaged properties at wildly inflated values; fraudulent values for Defendant Robert N. and Carol Coyle's ownership interests in the alter ego shell companies contrived by the Coyle Family Defendants and the Bryen Defendants to implement and cover-up their scams; and, the material nondisclosure of millions of dollars in fraudulently induced loan proceeds conveyed to the Coyle Family Defendants, including RNC Investments and the Coyle Family Trust.

108. Plaintiff Tordini, in reliance upon the Coyle Family Defendants' and the Bryen Defendants' representations and false financial statements, agreed to purchase twenty-five percent (25%) equity interest in Our Turn, d/b/a Savings Abstract.

109. Plaintiff Tordini knew that Defendant RNC Investments would be the majority owner, controlling seventy-five percent (75%) of the Our Turn equity.

110.    The Coyle Family Defendants and Bryen Defendants repeatedly represented to Plaintiff Tordini that the acquisition of Savings Abstract Company would be the first of many acquisitions in Our Turn's "plan" to become a full service financial company.

111.    Using the same fraudulent financial statements that induced Plaintiff Tordini to leave his executive banking position and lenders to make over $10,000,000 in loans, the Coyle Family Defendants and the Bryen Defendants fraudulently sought a $500,000 loan for Our Turn from First Republic Bank to acquire Savings Abstract, based upon the alleged financial strength and viability of Defendant RNC Investments and Defendants Robert N. and Carol Coyle.

112.    Based upon the fraudulent financial statements of Defendants Robert N. and Carol Coyle, as prepared and disseminated by the Bryen Defendants, First Republic Bank agreed to make loans totaling $500,000 to Our Turn for the purchase of Savings Abstract.

113.    Both First Republic Bank's $1,000,000 O'tay fraudulently induced loan and the $500,000 fraudulently induced Our Turn loan were secured by mortgages on fraudulently inflated properties and by the personal guarantees of Defendants Robert N. and Carol Coyle.

114.    Defendant Bruce Bryen personally – not his accounting firm-- received $26,000 at the closing of the $1,000,000 O'tay loan from First Republic Bank.

115.    Defendants cannot deny that the security provided to First Republic Bank for Our Turn's $500,000 loan is fraudulent. This loan is based on phony, grossly inflated appraisals and fraudulent financial statements provided to both Plaintiff Tordini and First Republic Bank, and includes at least two properties that had previously been sold among the Coyle Family Defendants.

116.    In fraudulently inducing the $1,000,000 loan to O'tay, and the $500,000 loan to Our Turn from First Republic Bank, the Coyle Family Defendants, Defendant O'tay and the

Bryen Defendants failed to disclose the prior existence of Equity One's $260,000 first mortgage on eight (8) of the properties that were subsequently fraudulently "mortgaged" to First Republic Bank.

117.    Both loans, scheduled to close on November 22, 2000, included cross-default or cross-collateralization conditions, which provide that in the event that any loan made by First Republic bank to an alter ego shell company defaults for any reason, then all other loans are immediately due and payable.

118.    In effect, a default by Defendants O'tay, Landvest I, Landvest II or Landvest III triggered a default by Derivative Plaintiff Our Turn.

119.    In the five (5) weeks following the closing of this fraudulently induced $1,000,000 loan from First Republic Bank to Defendant O'tay, the Coyle Family Defendants and Bryen Defendants distributed $847,300 to Defendant Robert N. Coyle, $55,000 to Defendant Vernon Coyle, and then another $50,000 to Defendant Carol Coyle.

120.    In January 2001, Equity One learned of the Defendants' fraudulent misconduct, and demanded repayment of its $260,000 loan.  The Coyle Family Defendants refused to pay, forcing Equity One to file suit against, inter alia, Defendants Robert N. Coyle, Carol Coyle, O'tay and Landvest I.

### C.    The Coyle Family Defendants' Fiduciary Misconduct, In Conspiracy With The Bryen Defendants, Abuses Our Turn To Implement And Fund The Defendants' Schemes.

121.    Before fraudulently inducing loans from First Republic Bank for both the Defendant O'tay and the Our Turn settlement, the Coyle Family Defendants and the Bryen Defendants knew there was insufficient cash flow from the rentals of properties owned by the

alter ego shell companies to meet the expenses of these properties, including real estate taxes and mortgage payments.

122.    The Coyle Family Defendants and the Bryen Defendants were further aware that they had to show property "values" and profits on the financial statements to support over $10,000,000 in fraudulently induced loans, at the time when the mortgaged properties and alter ego shell companies were really losing hundreds of thousands of dollars each.

123.    Further, the Coyle Family Defendants and the Bryen Defendants knew that the continuation of their Ponzi schemes required that they continue to borrow funds from unsuspecting banks using fraudulent financial statements, phony inflated appraisals, and a compliant, captive title insurance company, Derivative Plaintiff Our Turn d/b/a Savings Abstract.

124.    Thus, the Coyle Family Defendants' scheme required them, in concert with Defendants Bryen, to continue to falsely contrive hundreds of thousands of dollars in "paper profits" by transferring properties at wildly inflated values among the different Coyle Family Defendants' related alter ego shell companies.

125.    For example, shortly after fraudulently inducing $1.5 million in loans from First Republic Bank, Defendant Carol Coyle's Apple Development fraudulently conveyed several properties to another Defendant Coyle Family alter ego shell company, Defendant Nine LLC, at sales prices which were fraudulently represented to be significantly higher than the actual cost.

126.    This allowed Defendant Apple Development to show a phony paper profit of approximately $600,000, and allowed the Coyle Family Defendants' alter ego shell company Nine LLC to refinance these properties based upon this grossly inflated higher value, with unsuspecting banks victimized by these fraudulent appraisals and financial statements.

36

127.    Further, the Coyle Family Defendants' fraudulent scheme required the misrepresentation of phony paper profits and funding, including through continued false payment of "administrative" or "management" income and expense to the Coyle Family Defendants' alter ego companies, all to contrive the appearance of their making money.

128.    Thus, through Defendants' fraudulent, financial scheme of "paper profits", phony appraisals and over valued properties, the Coyle Family Defendants, individually and through their alter ego shell companies, misrepresented significant value on the Coyle Family Defendants' financial statements, thus fraudulently inducing banks to lend more money to fund Defendants' Ponzi schemes.

129.    In contrast to the failings of every alter ego Defendant which relied on rental income, in early 2001, Derivative Plaintiff Our Turn, d/b/a Savings Abstract, continued to show increasing net income through the successful leadership of Plaintiff Tordini.

130.    In early 2001, Defendant Robert N. Coyle represented the value of Our Turn at in excess of $2,500,000, providing Plaintiff Tordini with $625,000 in equity in Our Turn as of early 2001.

131.    Derivative Plaintiff Our Turn, unlike the alter ego shell companies, generates positive cash flow. For example, Derivative Plaintiff Our Turn's books and records confirm Plaintiff Tordini's successful leadership:

| | FOLEY'S SAVINGS ABSTRACT TITLE COMPANY | | | | OUR TURN'S D/B/A SAVINGS ABSTRACT | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | EST. | ACTUAL 1/1-8/31 | ANNUALIZED | BUDGET |
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2001 | 2001 |
| **INCOME ($000)** | | | | | | | |
| GROSS RECEIPTS | 1124 | 1762 | 1512 | 1350 | 1232 | 1848 | 1620 |
| INTEREST INCOME | 89 | 118 | 117 | 101 | 103 | 155 | 115 |
| | 1213 | 1880 | 1629 | 1451 | 1335 | 2003 | 1735 |
| LESS:COST OF SALES | | | | | | | |
| TITLE PREMIUMS | 169 | 217 | 207 | 175 | 176 | 264 | 211 |
| SEARCH FEES | 184 | 272 | 253 | 216 | 177 | 266 | 259 |
| TOTAL COST OF SALES | 353 | 489 | 460 | 391 | 353 | 530 | 470 |
| **GROSS INCOME** | **$860** | **$1391** | **$1169** | **$1060** | **$982** | **$1473** | **$1265** |
| **OPERATING EXPENSES** | | | | | | | |
| OFFICER COMPENSATION | 174 | 393 | 240 | 202 | 137 | 205 | 205 |
| SALARIES & COMMISSIONS | 370 | 544 | 586 | 513 | 405 | 608 | 551 |
| RENT | 15 | 18 | 17 | 17 | 17 | 26 | 23 |
| PAYROLL TAX EXPENSE | 35 | 56 | 69 | 68 | 44 | 66 | 81 |
| DEPRECIATION | 6 | 7 | 8 | 8 | 2 | 3 | 10 |
| ADVERTISING | 16 | 26 | 24 | 20 | 14 | 21 | 17 |
| EMPLOYEE BENEFITS | 8 | 9 | 11 | 13 | 15 | 23 | 16 |
| | $624 | $1053 | $955 | $841 | $634 | $951 | $903 |
| OTHER EXPENSES | | | | | | | |
| REPAIRS & MAINT. | 1 | 1 | 0 | | 0 | 0 | |
| OTHER TAXES | 10 | 10 | 15 | | 0 | 0 | |
| T & E | 12 | 24 | 8 | | 3 | 5 | |
| AUTO | 2 | 3 | 5 | | 4 | 6 | |
| UTILITIES | 4 | 4 | 4 | | 4 | 6 | |
| INSURANCE | 7 | 9 | 13 | | 8 | 12 | |
| EQUIP./BLDG. MAINTENANCE | 4 | 4 | 6 | | 4 | 6 | |
| POSTAGE/EXPRESS MAIL | 12 | 20 | 19 | | 12 | 18 | |
| PROFESSIONAL FEES | 3 | 5 | 7 | | 52 | 78 | |
| TELEPHONE | 11 | 14 | 10 | | 8 | 12 | |
| PRINTING | 2 | 3 | 2 | | 3 | 5 | |
| OFFICE SUPPLIES | 13 | 13 | 12 | | 23 | 35 | |
| MISCELLANEOUS | 3 | 1 | 6 | | 1 | 2 | |
| COMPUTER EXPENSE | 0 | 0 | 0 | | 0 | 0 | |
| DUES & SUBSCRIPTIONS | 1 | 1 | 1 | | 0 | 0 | |
| SEMINARS | 7 | 1 | 1 | | 0 | 0 | |
| | 92 | 113 | 109 | 95 | 122 | 183 | 113 |

mak: 51071.1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| TOTAL EXPENSES | 716 | 1166 | 1064 | 936 | 756 | 1134 | 1016 |
| **NET OPERATING INCOME** | **$144** | **$225** | **$105** | **$124** | **$226** | **$340** | **$249** |
| | | | | | | | |
| **OTHER INCOME/EXPENSE** | | | | | | | |
| MISCELLANEOUS INCOME | 2 | 7 | 43 | 0 | 0 | 0 | 0 |
| COMMISSION OVERAGE-FOLEY | 0 | 0 | 0 | 0 | -40 | -60 | 0 |
| AMORTIZATION | 0 | 0 | 0 | 0 | -127 | -191 | 0 |
| INTEREST EXPENSE | -9 | -12 | -14 | 0 | -50 | -75 | 0 |
| SECTION #179 DEDUCTIONS | -18 | -3 | -3 | 0 | 0 | 0 | 0 |
| MISCELLANEOUS EXPENSE | -1 | -1 | -1 | 0 | -1 | -2 | 0 |
| | -26 | -9 | 25 | 0 | -218 | -327 | 0 |
| **NET INCOME** | **$118** | **$216** | **$130** | **$124** | **$8** | **$13** | **$249** |

132.    When the Coyle Family Defendants realized that Derivative Plaintiff Our Turn was producing income in excess of expectations, the Coyle Family Defendants, through Defendant Robert Coyle, began to raid the Our Turn profits to illegally convey payments to the Coyle Family Defendants and to the failing alter ego shell companies, and thus add Our Turn as the support for the Ponzi scheme.

133.    To effectuate the scheme, the Coyle Family Defendants demanded that Plaintiff Tordini pay Defendant Landvest I a monthly "consulting fee" starting at $2,000, and then brazenly escalating to $6,000 a month, even though Our Turn had no business relationship with Defendant Landvest I.

134.    This phony "consultation fee" was never budgeted, and was not part of the plan agreed upon by Plaintiff Tordini and Defendants Robert N. Coyle and CPA Bryen.

135.    Defendant Landvest I in fact performed no "consulting" or other "services" for Derivative Plaintiff Our Turn.

136.    The Coyle Family Defendants and the Bryen Defendants failed to submit any documentation to support these phony "fees".

137.    Prior to November 2001, there was no consulting agreement or other document evidencing any reason for the payments of thousands of dollars a month of "fees" by Derivative Plaintiff Our Turn to the Coyle Family Defendants and their alter ego Defendants.  In November 2001, at the direction of the Bryen Defendants, the Coyle Family Defendants back-dated an agreement to mischaracterize these inter-company fees.

138.    These "consultation fees" are now robbing Derivative Plaintiff of in excess of $120,000 a year.

139.    The Coyle Family Defendants now represent that the payment of these fees is also to compensate Defendants Robert N. and Carol Coyle for their guarantees for the loan from First Republic Bank, even though Defendant Robert N. Coyle directed Our Turn to pay these hundreds of thousands of dollars in fees to Defendant Landvest, which did not guaranty any loan.

140.    Through these phony monthly "consulting fees," the Coyle Family Defendants, and their alter ego companies, siphoned tens of thousands of dollars in profits and business opportunities away from Derivative Plaintiff Our Turn, and distributions to Plaintiff Tordini.

141.    The Coyle Family Defendants directed Derivative Plaintiff Our Turn to pay over $25,000 in phony "accounting fees" to the Bryen Defendants for "services" provided to all of the Coyle Family Defendants and their alter ego companies.

142.    Thus, again, the Coyle Family Defendants sought to deprive Plaintiff Tordini of the value of his ownership in Derivative Plaintiff Our Turn, its assets and its business opportunities, and to rob Our Turn's assets to fund their fraudulent financial scams.

143.    In addition, Defendant Robert Coyle, acting as the agent for the Coyle Family Defendants, directed Derivative Plaintiff Our Turn to write a check to Defendant Landvest I for $50,000 as a "loan."

mak: 51071.1

144.    Plaintiff Tordini objected to this "loan" because Derivative Plaintiff Our Turn needed this working capital to fulfill the intent to make Our Turn into a full service financial business, as agreed upon by Defendants Robert N. Coyle and CPA Bryen, to induce Plaintiff Tordini to purchase a twenty-five percent (25%) interest in Our Turn.

145.    Defendant Robert N. Coyle told Plaintiff Tordini that the Coyle Family Defendants and the Bryen Defendants agreed that Our Turn could afford to make this $50,000 "loan" to Defendant Landvest.

146.    The Coyle Family Defendants and Bryen Defendants cannot deny that they repeatedly represented to Plaintiff Tordini that the purpose of this $50,000 "loan" was to purchase properties for Defendant Landvest, but then later swore that it was used as a "reserve account" for Landvest I.

147.    Confronted by Plaintiff Tordini's objections in Spring 2001 to these phony "fees" and "loans", the Coyle Family Defendants placed Defendant Linda Coyle Price in Our Turn to "learn the bookkeeping function" and to fire Our Turn's independent bookkeeper used by Plaintiff Tordini.

148.    To cover up their continuing fraudulent financial misconduct, the Coyle Family Defendants also hired another bookkeeper, Denise Kenegy.

149.    The Coyle Family Defendants agreed with the Bryen Defendants to pay Denise Kenegy as a full time subcontractor of Defendant Landvest I, but she, along with her husband, was included in Our Turn's medical insurance plan.

150.    The Coyle Family Defendants and the Bryen Defendants contrived this scam, even though Denise Kenegy was fraudulently representing to the Commonwealth of

Pennsylvania that she was unemployed, and was also receiving unemployment compensation from the Commonwealth of Pennsylvania.

151.    In addition, the Coyle Family Defendants and Bryen Defendants agreed to direct Derivative Plaintiff Our Turn to pay legal fees for work performed for another Defendant Coyle Family related company owned by Joe Carlin known as "re.com Real Estate".

152.    The Coyle Family Defendants then hired Joe Carlin's wife, Teresa Carlin, as a settlement clerk for Derivative Plaintiff Our Turn to handle the settlements on various Coyle Family Defendants' transactions, including a new company formed by the Coyle Family Defendants known as Ten Investments.

153.    In August 2001, Plaintiff Tordini became increasingly concerned when he learned that the Defendant Ten Investments intended to borrow in excess of $1,000,000 from Alliance Bank, secured in part by properties purchased by Ten Investments through Joe Carlin of re.com and insured by Our Turn d/b/a Savings Abstract Company.

154.    True to their fraudulent pattern and practices in earlier loans, Delloso was again the sweetheart appraiser supplying fraudulent and grossly inflated appraisals to Alliance Bank, and Teresa Carlin was the agent for Derivative Plaintiff Our Turn d/b/a Savings Abstract supplying the title insurance.

155.    In response to Plaintiff Tordini's concerns about this transaction, the Coyle Family Defendants, through Defendant Robert Coyle, threateningly questioned Plaintiff Tordini's loyalty.

156.    In August 2001, based on fraudulent financial statements prepared by the Bryen Defendants, Defendant Ten Investments fraudulently induced a loan in excess of $1,000,000 from Alliance Bank.

mak: 51071.1

43

157.    Over $800,000 of Defendant Ten Investments' loan settlement was quickly distributed to the Coyle Family Defendants.

158.    In September 2001, desperate for more loans to keep their Ponzi scheme alive, the Coyle Family Defendants accelerated their efforts to implement and further fund their fraudulent, financial scheme.

159.    In furtherance of Defendants' fraudulent financial scheme to induce the additional financing from First Republic Bank and Sterling Bank, on September 10, 2001, Defendant Robert N. Coyle requested First Republic Bank to accept 3180 Agate Street as substitute collateral for 2078 Allegheny Avenue.

160.    Defendant Robert N. Coyle misrepresented to First Republic Bank that this 3180 Agate Street property had a value of $60,000.

161.    To support this $60,000 grossly inflated value to First Republic Bank, the Coyle Family Defendants, through Defendant Robert Coyle, provided a September 1, 2001 $60,000 phony and inflated appraisal by Delloso.

162.    Again believing that Delloso's appraisal was accurate and independent, First Republic Bank agreed to accept 3180 Agate Street as substitute collateral for its loans to Defendant O'tay and to Our Turn, subject to receiving a title policy ensuring their first mortgage position on this 3180 Agate Street property.

163.    The Coyle Family Defendants, through their captive title insurance company, Derivative Plaintiff Our Turn d/b/a Savings Abstract, then issued a title insurance policy, with an effective date of September 12, 2001 with First Republic Bank as a named insured for $60,000 and with title on the effective date represented as vested in Defendant O'tay – the borrower on one of the First Republic Bank's November 22, 2000 loans.

164.    At the Coyle Family Defendants' direction, Our Turn mailed this fraudulent title insurance policy to First Republic Bank.

165.    On September 14, 2001 – fourteen (14) days after Delosso's fraudulent $60,000 appraisal - Defendant O'tay purchased the 3180 Agate Street property for $9,000, more than six (6) times less than the Coyle Family Defendants' fraudulent appraisals submitted to First Republic Bank on September 10, 2001.

166.    Further, in addition to First Republic Bank receiving this 3180 Agate Street property as collateral, the Coyle Family Defendants and Bryen Defendants' financial statements also fraudulently induced Sterling Bank to also make a $20,000 loan to Defendant Ten Investments on September 14, 2001.

167.    Sterling Bank also received this same 3180 Agate Street property as collateral.

168.    The Coyle Family Defendants and the Bryen Defendants represented to Sterling Bank that Defendant Ten Investments owned 3180 Agate Street.

169.    Specifically, Derivative Plaintiff Our Turn's title policy, sent to Sterling Bank on October 19, 2001, misrepresented title to be vested in Defendant Ten Investments on September 14, 2001 for this same 3180 Agate Street property.

170.    In reality, the 3180 Agate Street property was actually purchased by Defendant O'tay on September 14, 2001.

171.    The Coyle Family Defendants failed to disclose to either Sterling Bank or First Republic Bank that they used Derivative Plaintiff Our Turn d/b/a Savings Abstract as their vehicle to create fraudulent duplicative title policies.

172.    Thus, Derivative Plaintiff Our Turn d/b/a Savings Abstract, on September 14, 2001, provided title insurance to two different banks on this very same 3180 Agate Street

property, and issued fraudulent title policies insuring that both banks had first mortgages on the same property.

173.    By fraudulently using Derivative Plaintiff Our Turn, d/b/a Savings Abstract to provide fraudulent title insurance policies, the Coyle Family Defendants obtained additional financing from First Republic Bank and Sterling Bank.

174.    By abusing Our Turn's license to issue phony title reports and directing Our Turn, through Teresa Carlin, Joe Carlin and Lou Delloso to contrive fraudulent title reports, the Coyle Family Defendants received $53,000 in loan proceeds on this 3180 Agate Street property purchased for only $9,000 two days earlier.

175.    On September 14, 2001, on the same day that the Coyle Family Defendants and the Bryen Defendants were using Derivative Plaintiff Our Turn to issue these false title insurance policies, the Coyle Family Defendants, as agreed by the Bryen Defendants, terminated Plaintiff Tordini's employment and thus removed his ability to independently scrutinize their pattern of fraudulent and fiduciary misconduct.

176.    In response, Plaintiff Tordini commenced an action in the Court of Common Pleas of Philadelphia County seeking recovery for breaches of his Employment Agreement and the Operating Agreement.

177.    To cover up their pattern of fraudulent and fiduciary misconduct, the Coyle Family Defendants losing and destroying crucial documents, including Derivative Plaintiff Our Turn's and Plaintiff Tordini's files.

178.    As the Coyle Family Defendants intended, Our Turn never became a financial services company; to the contrary, the Coyle Family Defendants hire insider appraisers and insider real estate agents to further usurp corporate opportunities of Our Turn.

mak: 51071.1

179.    Further, the Coyle Family Defendants now claim ignorance of any of the financial operations of their scheme, and do not deny that the Bryen Defendants created and implemented all of the financial frauds and fiduciary misconduct detailed herein.

180.    As now confirmed, the Coyle Family Defendants are not current in the real estate taxes owed on the hundreds of properties owned by their alter ego shell companies, and with interest and penalties, owe over $400,000 in delinquent real estate taxes to the City of Philadelphia.

181.    The failure to pay real estate taxes when due is an event of default in every related loan document, including the Our Turn loan.

182.    The Coyle Family Defendants have received millions of dollars as a result of their fraudulent and fiduciary misconduct, and, in conspiracy with the Bryen Defendants, continue to abuse Derivative Plaintiff Our Turn, d/b/a Savings Abstract, to present false title insurance policies to lenders to fraudulently obtain funds to continue their Ponzi scheme.

**COUNT I**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10(b)-5**
(*Plaintiff Tordini v. Coyle Family Defendants and Bryen Defendants*)

183.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as fully set forth herein.

184.    As set forth in detail above, on November 22, 2000, Plaintiff Tordini purchased a 25% ownership interest in Our Turn in consideration for his leaving his executive banking position to become Our Turn's first President and Chief Operating Officer.

185.    The ownership interests in Our Turn are securities.

186.    As set forth herein, in reliance upon the false financial statements provided to him by the Coyle Family Defendants and the Bryen Defendants concerning the alleged financial

worth of Defendants Robert N. and Carol Coyle and R.N.C. Investments, as well as their failure to disclose that their scheme to use Our Turn, LLC to implement and cover up Defendants' pattern of fraudulent financial misconduct, Plaintiff Tordini agreed to leave his executive banking position and purchase securities in Our Turn.

187.    The Coyle Family Defendants, individually and collectively, and acting both as the control person and agent of the control person of Our Turn, made these misrepresentations, but failed to disclose material facts which directly and proximately resulted in Plaintiff Tordini's agreeing to purchase a twenty-five percent (25%) interest in Our Turn.

188.    As set forth herein, beginning in May 2000, Defendants Robert N. Coyle and R.N.C. Investments, as the authorized agents for the Coyle Family Defendants and the Bryen Defendants, fraudulently induced Plaintiff to leave his executive banking position and to purchase securities in the newly formed entity, Our Turn, LLC, through misrepresentations and non-disclosure of material facts including, but not limited to:

      a.    the financial condition of Defendants Robert N. and Carol Coyle and R.N.C. Investments and the Coyle Family Defendants, including non-disclosure of Defendants' fraudulent financial schemes set forth herein, which conveyed millions of dollars in fraudulently induced loan proceeds to the Coyle Family Defendants;

      b.    the pattern of fraudulent, financial misconduct engaged in by the Coyle Family Defendants and the Bryen Defendants and their real purpose in acquisitioning a title insurance company, Our Turn d/b/a Savings Abstract, namely, to implement their pattern of fraudulent, financial misconduct set forth herein;

     c.     the Coyle Family Defendants and Bryen Defendants' intended abuse of this title insurance company to cover up their scams on federally insured banks, the Internal Revenue Service, the City of Philadelphia, the Commonwealth of Pennsylvania, federal, state and local taxing agencies, labor enforcement authorities and others; and,

     d.     the Coyle Family Defendants and Bryen Defendants' intent to purchase Derivative Plaintiff Our Turn, d/b/a Savings Abstract, a title insurance company to further implement their fraudulent financial schemes.

189.    As set forth herein, the Coyle Family Defendants acted at all material times through their authorized agent, Defendants Robert N. Coyle and R.N.C. Investments.

190.    As set forth herein, the Bryen Defendants themselves, through their authorized agent, CPA Bryen, made false and misleading statements and material omissions that they knew, or should have known, were shown to Plaintiff Tordini to induce his purchase of securities.

191.    The Coyle Family Defendants cannot deny that the Bryen Defendants prepared and disseminated the financial statements of Defendants Robert N. and Carol Coyle and R.N.C. Investments that were provided to Plaintiff Tordini to induce his purchase of securities.

192.    The Coyle Family Defendants cannot deny that the Bryen Defendants prepared and disseminated the fraudulent financial statements of the Defendant alter ego shell companies which formed the basis for over ninety percent (90%) of the financial worth of Defendants Robert N. and Carol Coyle.

193.    As set forth herein, from May 2000 through November 22, 2000, the Coyle Family Defendants and Bryen Defendants, directly and indirectly, intentionally, willfully and recklessly, by use of a means and instrumentality of interstate commerce and the mails and

phone lines, used and employed in connection with the sales of securities in Derivative Plaintiff Our Turn, d/b/a Savings Abstract, manipulative and deceptive devices and contrivances to defraud Plaintiff Tordini; engage in acts and practices in the course of business which operated to defraud Plaintiff Tordini and intentionally and recklessly omitted to disclose the material facts necessary to fully advise Plaintiff Tordini, all in order to induce the sale of Derivative Plaintiff Our Turn's securities to Plaintiff Tordini.

194.    The Coyle Family Defendants and Bryen Defendants both knew and intended for Plaintiff Tordini to rely upon the false misrepresentations and material omissions set forth herein.

195.    Plaintiff Tordini justifiably relied upon both the Coyle Family Defendants' and the Bryen Defendants' fraudulent misrepresentations and omissions of material facts in purchasing securities of Our Turn.

196.    The Coyle Family Defendants' and Bryen Defendants' misconduct violates §10(b) of the Exchange Act and Rule 10b-5, as a direct result of which Plaintiff Tordini has suffered substantial damages in excess of the jurisdictional limits for arbitration.

**WHEREFORE**, Plaintiff Tordini respectfully requests that this Court enter judgment on Count I against the Coyle Family Defendants and Bryen Defendants, and in favor of Plaintiff Tordini in the form of compensatory damages; together with interest and costs of law suit; trial by jury; attorneys' fees; and awarding Plaintiff Tordini such other relief as this Court deems appropriate.

### COUNT II
### <u>VIOLATION OF THE PENNSYLVANIA SECURITIES ACT</u>
*(Plaintiff Tordini v. Coyle Family Defendants and Bryen Defendants)*

197.    Plaintiff incorporates by reference the allegations contained in the foregoing

paragraphs as fully set forth herein.

198.    On November 22, 2000, Plaintiff Tordini purchased securities of Our Turn in reliance upon the misrepresentations and material omissions of both the Coyle Family Defendants and Bryen Defendants, including those specifically identified in Count I of this Complaint.

199.    As set forth herein, the Coyle Family Defendants acted at all material times through their authorized agent, Defendants Robert N. Coyle and R.N.C. Investments.

200.    As set forth herein, the Bryen Defendants themselves, through their authorized agent, CPA Bryen, made false and misleading statements and material omissions that they knew, or should have known, were shown to Plaintiff Tordini to induce his purchase of securities.

201.    The Coyle Family Defendants cannot deny that the Bryen Defendants prepared and disseminated the financial statements of Defendants Robert N. and Carol Coyle and R.N.C. Investments that were provided to Plaintiff Tordini to induce his purchase of securities.

202.    The Coyle Family Defendants cannot deny that the Bryen Defendants prepared and disseminated the fraudulent financial statements of the Defendant alter ego shell companies which formed the basis for over ninety percent (90%) of the financial worth of Defendants Robert N. and Carol Coyle.

203.    As set forth herein, beginning in May 2000 and continuing until November 22, 2000, the Coyle Family Defendants' and Bryen Defendants' misrepresentations and non-disclosure of material facts fraudulently induced Plaintiff Tordini to leave his executive banking position and to purchase securities in a newly formed business, Derivative Plaintiff Our Turn, LLC, d/b/a Savings Abstract.

204.    As set forth herein, the Coyle Family Defendants and Bryen Defendants knew of

their misrepresentations and nondisclosures, including in the fraudulent financial statements of Defendants RNC Investments and Robert N. and Carol Coyle.

205.    As set forth herein, from May 2000 through November 22, 2000, the Coyle Family Defendants and Bryen Defendants, directly and indirectly, intentionally, willfully and recklessly, by use of a means and instrumentalities of interstate commerce and the mails and phone lines, used and employed in connection with the sales of securities of Derivative Plaintiff Our Turn, d/b/a Savings Abstract, manipulative and deceptive devices and contrivances to defraud Plaintiff; engaged in acts and practices in the course of business which operated to defraud Plaintiff and intentionally and recklessly omitted to disclose the material facts necessary to fully advise Plaintiff, all in order to induce the sale of Our Turn securities to Plaintiff.

206.    The Coyle Family Defendants and Bryen Defendants knew and intended for Plaintiff Tordini to rely upon the false misrepresentations and omissions of material facts made to him in purchasing securities of Our Turn.

207.    Plaintiff Tordini justifiably relied upon the Coyle Family Defendants and Bryen Defendants' fraudulent misrepresentations and omissions of material facts in purchasing securities of Our Turn.

208.    The Coyle Family Defendants and Bryen Defendants' misconduct constitute a violation of §401 of the Pennsylvania Securities Act, and as a direct result of which Plaintiff Tordini has suffered substantial damage in excess of the jurisdictional limits for arbitration in this Court..

**WHEREFORE**, Plaintiff Tordini respectfully requests that this Court to enter judgment on Count II against the Coyle Family Defendants and Bryen Defendants, jointly and severally, and in favor of Plaintiff Tordini by awarding Plaintiff Tordini compensatory damages; together with

interest and costs, reasonable attorneys' fees; and awarding Plaintiff Tordini such other relief as this Court deems appropriate.

## COUNT III
## FRAUDULENT MISREPRESENTATION AND NON-DISCLOSURES
### (*Plaintiff Tordini v. Coyle Family Defendants and Bryen Defendants*)

209.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as fully set forth herein.

210.    As set forth in detail above, on November 22, 2000, Plaintiff Tordini purchased a 25% ownership interest in Our Turn in consideration for his leaving his executive banking position to become Our Turn's first President and Chief Operating Officer.

211.    As set forth herein, in reliance upon the false financial statements provided to him by the Coyle Family Defendants and the Bryen Defendants concerning the alleged financial worth of Defendants Robert N. and Carol Coyle and R.N.C. Investments, as well as their failure to disclose that their scheme to use Our Turn, LLC to implement and cover up Defendants' pattern of fraudulent financial misconduct, Plaintiff Tordini agreed to leave his executive banking position and purchase securities in Our Turn.

212.    The Coyle Family Defendants, individually and collectively, and acting both as the control person and agent of the control person of Our Turn, intentionally and recklessly made these misrepresentations, but failed to disclose material facts which directly and proximately resulted in Plaintiff Tordini's agreeing to purchase a twenty-five percent (25%) interest in Our Turn.

213.    As set forth herein, beginning in May 2000, Defendants Robert N. Coyle and R.N.C. Investments, as the authorized agents for the Coyle Family Defendants and the Bryen Defendants, fraudulently induced Plaintiff to leave his executive banking position and to

purchase securities in the newly formed entity, Our Turn, LLC, through misrepresentations and non-disclosure of material facts including, but not limited to:

    a.    the true financial condition of Defendants Robert N. and Carol Coyle and R.N.C. Investments and the Coyle Family Defendants, including non-disclosure of Defendants' fraudulent financial schemes set forth herein, which conveyed millions of dollars in fraudulently induced loan proceeds to the Coyle Family Defendants;

    b.    the pattern of fraudulent, financial misconduct engaged in by the Coyle Family Defendants and the Bryen Defendants and their real purpose in acquisitioning a title insurance company, Our Turn d/b/a Savings Abstract, namely, to implement their pattern of fraudulent, financial misconduct set forth herein;

    c.    the Coyle Family Defendants and Bryen Defendants' intended abuse of this title insurance company to cover up their scams on federally insured banks, the Internal Revenue Service, the City of Philadelphia, the Commonwealth of Pennsylvania, federal, state and local taxing agencies, labor enforcement authorities and others; and,

    d.    the Coyle Family Defendants and Bryen Defendants' intent to purchase Derivative Plaintiff Our Turn, d/b/a Savings Abstract, a title insurance company to further implement their fraudulent financial schemes.

214.    As set forth herein, the Coyle Family Defendants acted at all material times through their authorized agent, Defendants Robert N. Coyle and R.N.C. Investments.

215.    As set forth herein, the Bryen Defendants themselves, through their authorized

agent, CPA Bryen, made false and misleading statements and material omissions that they knew, or should have known, were shown to Plaintiff Tordini to induce his purchase of securities and leave his executive position in the banking industry.

216.    The Coyle Family Defendants cannot deny that the Bryen Defendants prepared and disseminated the financial statements of Defendants Robert N. and Carol Coyle and R.N.C. Investments that were provided to Plaintiff Tordini to induce his purchase of securities.

217.    The Coyle Family Defendants cannot deny that the Bryen Defendants prepared and disseminated the fraudulent financial statements of the Defendant alter ego shell companies which formed the basis for over ninety percent (90%) of the financial worth of Defendants Robert N. and Carol Coyle.

218.    The Coyle Family Defendants and Bryen Defendants knew and intended for Plaintiff Tordini to rely upon the false misrepresentations and material omissions set forth herein.

219.    Plaintiff Tordini justifiably relied upon the Coyle Family Defendants' and the Bryen Defendants' fraudulent misrepresentations and omissions of material facts in purchasing securities of Our Turn.

220.    As a direct and proximate result of the Coyle Family Defendants and Bryen Defendants misconduct, Plaintiff Tordini has suffered substantial damages in excess of the jurisdictional limits for arbitration in this Court.

221.    The misconduct of the Coyle Family Defendants and the Bryen Defendants, as alleged herein, was intentional, willful, wanton and outrageous, and warrants the imposition of punitive damages jointly and severally.

**WHEREFORE**, Plaintiff Tordini respectfully requests that this Court enter judgment on Count III against the Coyle Family Defendants and the Bryen Defendants, jointly and severally, and in favor of Plaintiff Tordini by awarding him compensatory damages; punitive damages; together with interest and costs of law suit; trial by jury; and, awarding Plaintiff Tordini such other relief as this Court deems appropriate.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
*(Plaintiff Tordini v. the Coyle Family Defendants)*

222.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as fully set forth herein.

223.    The Coyle Family Defendants, as fiduciaries to Plaintiff as controlling persons of Our Turn, had a duty to act with reasonable care, prudence and complete candor in their relationship with Plaintiffs.

224.    As more specifically plead herein, the Coyle Family Defendants breached their foregoing duty of care, prudence and complete candor to Plaintiff Tordini through misrepresentations and material omissions set forth herein.

225.    The Coyle Family Defendants knew, or should have known, that their misrepresentations and material omissions, as specifically set forth herein, were material to Plaintiff Tordini's decision to leave his senior executive position with a bank, purchase securities in Our Turn, and lend his credibility to the formation and management of Our Turn; his actions in reliance on the Coyle Family Defendants' misconduct allowed the Coyle Family Defendants to receive substantial monetary benefits and, substantially harm Plaintiff.

226.    The Coyle Family Defendants knew, or should have known, that their misrepresentations and material nondisclosures, as specifically set forth herein were, when made,

untrue and/or the Coyle Family Defendants had no reasonable basis for believing such statements were true when made.

227.    Had Plaintiff Tordini known of the material falsehoods, Plaintiff Tordini would not have, inter alia, left his senior executive position with a bank, purchased securities in Our Turn, and lent his credibility to the formation and management of Our Turn, and would not have allowed the Coyle Family Defendants to obtain substantial monetary benefits.

228.    As a direct and proximate result of the Coyle Family Defendants' negligent misrepresentations,  Plaintiff Tordini has sustained damages in excess of the jurisdictional limits for arbitration in this Court.

**WHEREFORE**, Plaintiff Tordini respectfully requests that this Court enter judgment on Count IV against the Coyle Family Defendants, jointly and severally, and in favor of Plaintiff by awarding Plaintiff Tordini compensatory damages; together with interest and costs; trial by jury; and, awarding Plaintiff such other relief as this Court deems appropriate.

### COUNT V
### BREACH OF FIDUCIARY DUTIES
*(Plaintiff Tordini, derivatively on behalf of Our Turn v. Coyle Family Defendants)*

229.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as fully set forth herein.

230.    The Coyle Family Defendants, as controlling persons of Our Turn, owe fiduciary duties of loyalty, care, good faith and candor to Derivative Plaintiff Our Turn.

231.    As specifically set forth herein, the Coyle Family Defendants breached their fiduciary duties of loyalty to Derivative Plaintiff Our Turn by self dealing and promoting their self interests over the interests of Our Turn and through funding competing entities, such as Delloso and

re.com real estate, and by converting the assets of Derivative Plaintiff Our Turn to fuel the ongoing fraudulent financial scheme detailed herein.

232.    As specifically set forth herein, the Coyle Family Defendants breached their fiduciary duty of care to Derivative Plaintiff Our Turn by their failure to fully and properly review the effect of their representations upon the marketplace, and their abuse of Our Turn's regulated status to further their ongoing fraudulent financial scheme.

233.    The Coyle Family Defendants breached their fiduciary duty of candor to the Derivative Plaintiff by their fraudulent and negligent misrepresentations and material omissions, as specifically set forth herein.

234.    As a result of the breach of the fiduciary duties set forth herein, Derivative Plaintiff Our Turn has suffered substantial injury in the ongoing scheme in excess of the jurisdiction limits for arbitration in this Court.

235.    Each Coyle Family Defendant, as well as others involved in their ongoing fraudulent financial scheme who will be named in discovery, knowingly and substantially benefited from these breaches of fiduciary duty, including the improper and unjust receipt of funds in excess of the jurisdictional limits for arbitration in this Court.  See Chart, p. 29, *supra*.

236.    The Coyle Family Defendants' breaches of fiduciary duty are intentional, willful, wanton and outrageous, and warrant the imposition of punitive damages.

**WHEREFORE**, Plaintiff, derivatively on behalf of Our Turn, respectfully requests that this Court enter judgment on Count V against the Coyle Family Defendants, jointly and severally, and in favor of Derivative Plaintiff in the form of awarding Our Turn compensatory damages; punitive damages; together with interest and costs; attorneys' fees; distribution of any damages award to

Plaintiff Tordini equal to his 25% ownership interest; trial by jury; and, awarding Derivative

Plaintiff such other relief as this Court deems appropriate.

**COUNT VI**
**CONSPIRACY TO BREACH FIDUCIARY DUTIES**
*(Plaintiff Tordini, derivatively on behalf of Our Turn v.*
*Coyle Family Defendants and Bryen Defendants)*

237.    Plaintiff incorporates by reference the allegations contained in the foregoing

paragraphs as if fully set forth herein.

238.    The Coyle Family Defendants and the Bryen Defendants agreed and conspired

among themselves and others who will be named in discovery to, inter alia, breach the fiduciary

duties owed by the Coyle Family Defendants as the controlling persons of Our Turn.

239.    Acts in furtherance of the Coyle Family Defendants' and the Bryen Defendants'

conspiracy occurred when these Defendants reached secret understandings concerning, by way of

example, and subject to further discovery: the fraudulent misrepresentations to be made to lenders to

induce loan financings; creating back dated agreements to justify the payments of "fees" to the

Coyle Family Defendants by Our Turn; abusing Our Turn's regulated status to issue fraudulent title

insurance policies; abusing Our Turn to fund the ongoing fraudulent financial schemes detailed

herein; misrepresenting the employment status of Our Turn employees; and, destroying records of

Plaintiff Tordini to conceal the ongoing misconduct victimizing Our Turn.

240.    The Coyle Family Defendants and Bryen Defendants, act through their principals,

Defendant Robert N. Coyle and Defendant Bruce Bryen, both of whom have been unjustly enriched

through the ongoing fraudulent financial misconduct.

241.    The Coyle Family Defendants' and Bryen Defendants' joint acts constitute a wrongful combination or agreement to do unlawful acts, or, alternatively, a wrongful combination to do otherwise lawful acts by unlawful means.

242.    The Coyle Family Defendants' and Bryen Defendants' concerted overt acts were malicious and without justification or excuse.

243.    As a direct and proximate result of the Coyle Family Defendants and Bryen Defendants' conspiratorial misconduct, Derivative Plaintiff Our Turn has suffered and will continue to suffer damages in excess of this jurisdiction's arbitration limits.

244.    The Coyle Family Defendants' and Bryen Defendants' misconduct was intentional, willful, wanton and outrageous, and warrants the imposition of punitive damages against them, jointly and severally.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment on Count VI against the Coyle Family Defendants and the Bryen Defendants, jointly and severally, and in favor of Derivative Plaintiff in the form of awarding Our Turn compensatory damages; punitive damages; together with interest and costs; attorneys' fees; distribution of any damages award to Plaintiff Tordini equal to his 25% ownership interest; trial by jury; and, awarding Derivative Plaintiff Our Turn such other relief as this Court deems appropriate under the circumstances.

### COUNT VII
### EQUITABLE RELIEF IN THE NATURE OF CONSTRUCTIVE TRUST, APPOINTMENT OF A  RECEIVER *PENDENTE LITE*, ACCOUNTING AND DISGORGEMENT
### *(Plaintiff Tordini v. All Defendants)*

245.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

246.    Plaintiff Tordini, as an owner of Our Turn, is entitled to an order imposing a

constructive trust on all assets, liabilities and payments to the extent of precluding all payments to any Defendant by Our Turn *pendente lite*, and prohibiting any payments outside of the ordinary course without approval of the court appointed receiver *pendente lite*.

247.    Plaintiff Tordini, as an owner of Our Turn, is entitled to an order appointing a receiver *pendente lite* to manage and secure the limited assets and current and prospective business and contractual opportunities for Our Turn, and thus remove the continuing irreparable harm created by the plead illegal, oppressive and fraudulent misconduct; and, the misapplication and waste of Our Turn's assets, as set forth herein.

248.    Plaintiff Tordini is entitled to an order for an accounting of all transactions relating or referring to the Coyle Family Defendants and the alter ego shell companies controlled by them, including but not limited to:  Defendants Landvest I; Landvest II ; Landvest III; O'tay; Alivest; Apple Development Services Corp.; R.N.V.C., Inc., JC Real Estate Investments; Nine; Ten; Robert N. Coyle Sr. & Sons Real Estate, Inc.; Memory and LVJ (collectively, "alter ego shell companies").  See Chart, p. 29, *supra.*

249.    Plaintiff Tordini is entitled to an order of disgorgement from all Defendants, including the Bryen Defendants, that have received money or property through the ongoing fraudulent financial schemes creating a default on Our Turn's loan to First Republic Bank, an investigation into its regulatory status, or are otherwise not supported by invoices for services provided.

250.    It is beneficial to the interests of Our Turn that its assets and opportunities be secured against the immediate and continuing fraudulent and fiduciary misconduct of the Coyle Family Defendants, and the alter ego shell companies, as set forth herein.

251.    There is no remedy at law to preserve the assets of Our Turn from the continuing

misconduct of the Coyle Family Defendants and the alter ego shell companies, until such time as this Court has an opportunity to enter final equitable relief.

252.    Absent this equitable relief, Plaintiff Tordini will be irreparably and continually injured by the ongoing misconduct of Defendants Robert N. Coyle, Carol Coyle, Vernon Coyle, Linda Coyle Price, RNC Investments and the Coyle Family Trust, as controlling persons of Our Turn.

**WHEREFORE**, Plaintiff Tordini demands judgment in his favor in the form of equitable relief against all Defendants, including the imposition of a constructive trust over Our Turn's assets and financial condition; appointment of a receiver to protect the assets of Our Turn *pendente lite*; for an accounting; for an order of disgorgement; for attorneys fees and costs; and, for such other and further relief as the Court deems just and proper in its equitable powers.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

ELLIOTT REIHNER SIEDZIKOWSKI & EGAN, P.C.

/s/ Mark A. Kearney
MARK A. KEARNEY
Union Meeting Corporate Center V
925 Harvest Drive
Blue Bell, PA  19422
(215) 977-1000

Counsel for Plaintiff

DATED:  May 2, 2002