## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOHN TORDINI,** | : |
| *Individually and Derivatively* | : |
| *On behalf of Our Turn LLC,* | : |
| | : |
| **Plaintiff,** | :     C.A. No. 02-2653 |
| | : |
| | :     **JURY TRIAL DEMANDED** |
| **v.** | : |
| | : |
| **ROBERT N. COYLE, et.al.,** | : |
| | : |
| **Defendants.** | : |

## O R D E R

    **AND NOW,** this _____ day of June 2002, upon consideration of the Coyle Defendants'

Motion to Dismiss the Complaint, or in the Alternative for Summary Judgment, and Plaintiff's

Opposition thereto, it is hereby **ORDERED, ADJUDGED** and **DECREED** that Defendants'

Motion is **DENIED.**


                         _____

                         KATZ, S.J.
                         United States District Court

mak: 52233.1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOHN TORDINI,**<br>   ***Individually and Derivatively***<br>   *On behalf of Our Turn LLC* | : <br> : <br> : <br> : |
|              **Plaintiff,** | :      **C.A. No. 02-2653** |
| | : |
| | :      **JURY TRIAL DEMANDED** |
|       **v.** | : |
| | : |
| **ROBERT N. COYLE, et.al.,** | : |
| | : |
|              **Defendants.** | : |

### PLAINTIFF'S OPPOSITION TO THE COYLE DEFENDANTS'
### MOTION TO DISMISS, OR IN THE ALTERNATIVE,
### <u>FOR SUMMARY JUDGMENT</u>

OF COUNSEL:
ELLIOTT REIHNER SIEDZIKOWSKI
  & EGAN, P.C.

JOHN M. ELLIOTT
MARK A. KEARNEY
ROGER J. HARRINGTON, JR.
Union Meeting Corporate Center V
925 Harvest Drive, Suite 300
Blue Bell, PA  19422
(215) 977-1000


DATE:  June 14, 2002

Attorneys for Plaintiff

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................1

II.     FACTS COMPELLING DENIAL OF THE MOTION........................................3

        A.      The Defendants Misrepresent And Fail To Disclose Their Fraudulent
                Financial Scheme To Induce Plaintiff Tordini To Purchase Securities
                In Our Turn ..........................................................................................3

        B.      Defendants' Admitted Exclusive Control Over Our Turn.....................5

        C.      Plaintiff Tordini's Lack Of A Role In Forming Our Turn...................11

        D.      Plaintiff Tordini Confirms His Limited Role As a Manager…………………..13

III.    ARGUMENT  ...........................................................................................14

        A.      Plaintiff Tordini's Minority Ownership Interest Is A Security............15

        B.      This Court Must Retain Jurisdiction Over All Claims.........................20

IV.     CONCLUSION…............................................................................................21

# TABLE OF AUTHORITIES

## Federal Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)……..……………………………………………………………15

*Bell Atlantic-Pennsylvania, Inc. v Pennsylvania Public Utility Commission*,
107 F.Supp. 653 (E.D.Pa. 2000)……………………………………………………15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)……………………………………………………...…………15

*Dalicandro v. Legalgard, Inc.*,
No.CIV.A. 99-3778, 2001 WL 1428359 (E.D.Pa. Nov. 14, 2001)…………………...21

*Giannone v. United States Steel Corp.*, 238 F.2d 544  (3d Cir. 1956)……………………………6

*Giles v. St. Paul Fire & Marine Insurance Co.*,
405 F. Supp. 719 (N.D.Ala.1975)……………………………………………………6

*Great Lakes Chemical Corp. v. Monsanto Co.*,
97 F.Supp.2d 376 (D.Del. 2000)……………………………………………………20

*Growth Horizons, Inc.v. Delaware County, Pa.*,
983 F.2d 1285 (3d Cir. 1973) ……………………………………………………21

*Hall v. United States*,
314 F. Supp. 1135 (N.D.Cal.1970) ……………………………………………… 6

*Hirsch v. Dupont*,
396 F. Supp. 1214 (S.D.N.Y. 1975) …………………………………………… 19

*Hollinger v. Wagner Mining Equipment Co.*,
667 F.2d 402 (3d 1982) ……………………………………………………15

*In re Chambers Devel. Co., Inc.*,
148 F.3d 214 (3d Cir. 1998) ……………………………………………………6

*International Brotherhood of Teamsters v. Daniel*,
439 U.S. 551 (1979) ……………………………………………………...17

*Keith v. Black Diamond Advisors, Inc.*,
48 F.Supp.2d 326 (S.D.N.Y. 1999) …………………………………………………..18

*Kolodij v. Consolidated Rail Co.*,

1998 WL 792153  (E.D.Pa., Nov. 10, 1998) …………………………………………… 15

*Lino v. Citing Investing Co.*,
487 F.2d 689 (3d Cir. 1973) ……………………………………………….. 17

*Markowitz v. Northeast Land Co.*,
906 F.2d 100 (3rd Cir. 1990) ……………………………………………………....15

*McFeeley v. Florig*,
966 F.Supp. 378 (E.D.Pa. 1997) ……………………………………..………………… 21

*O'Neil v. Four States Builders & Remodelers, Inc.*,
484 F. Supp. 18 (E.D. Pa. 1979) ………………………………………………… 6

*Riseman v. Advanta Corp.*,
2001 U.S. Dist. LEXIS 15760  (E.D. Pa.) ……………………………………………..6

*Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*,
840 F.2d 236 (4th Cir. 1998) ……………………………………………………19

*Scattergood v. Perelman*,
945 F.2d 618 (3d Cir. 1991). …………………………………………………… 21

*Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, Inc.,
976 F.2d 58, 61 (1st Cir. 1992) …………………………………………………...6

*SEC v Bennet*,
889 F.Supp 804 (E.D. Pa. 1995) …………………………………………………. 16

*SEC v Friendly Power Co., LLC*,
49 F.Supp.2d 1363 (S.D. Florida 1999) ……………………………………………18

*SEC v. Glen W. Turner Enterprises, Inc.*,
474 F.2d 476 (9th Cir. 1973) …………………………………………………………17

*SEC v. Howey*,
328 U.S. 293 (1946) …………………………………………………… 2, 14-17, 19-20

*SEC v. Hughes Capital Corp.*, 124 F.3d 449 (3d Cir. 1997) ………………………………15

*SEC v. Infinity Group Company*, 212 F.3d 180 (3d Cir. 2000) …………………………………16

*SEC v. Parkersburg Wireless L.L.C.*, 991 F.Supp. 6 (D.D.C. 1997) ………………………16

*SEC v. Shreveport Wireless Cable Television P'ship*,

No. Civ.A. 94-1781, 1998 WL 892948 (D.D.C. Oct. 20, 1998) …………………...…19

*Steinhardt Group Inc. v. Citicorp*,
    126 F.3d 144 (3d Cir. 1997) ……………………………………………………16-17

*Syncor International Corp. v. Mody*,
    1999 WL 257758 (E.D.Pa., April 29, 1999) …………………………………………15

*Tchereepin v. Knight*, 389 U.S. 332 (1967) ……………………………..………………14, 16, 19

*Thompson v. Fare, Jr.*,
    173 F.Supp.2d 368 (E.D.Pa. 2001) ………………………………………………...15

*United Housing Foundation, Inc. v. Forman*,
    421 U.S. 837 (1975) ………………………………………………………… 14, 16, 17

*United Mine Workers of America v. Gibbs*,
    383 U.S. 715 (1966) …………………………………………………………..21

**Statutes**

70 P.S.C.A. § 1-102(t)…..………………………………………………………………14

## I.    INTRODUCTION

From June through November 22, 2000, as specifically alleged, the Coyle Defendants[1] misrepresented and failed to disclose several material facts to induce Plaintiff John Tordini ("Plaintiff Tordini") to purchase a minority ownership interest in Our Turn LLC ("Our Turn"), as part of his three year employment compensation. *See* Complaint ¶¶ 13-15, 104-120, included in Appendix filed herewith ("A") at 6-7, 32-35.

Upon discovery of the Defendants' ongoing Ponzi scheme, Plaintiff Tordini filed this action seeking compensatory and punitive damages individually, and derivatively on behalf of Our Turn, against the Coyle Defendants and their financial advisors who created and coordinated this Ponzi scheme[2].  This Court's May 6 and May 28, 2002 Orders confirm that discovery closes on July 31, 2002.   Discovery is ongoing.

The Coyle Defendants' motion to dismiss, or alternative premature motion for summary judgment, must be denied.  Their motion's <u>only</u> argument must be denied, because it inherently raises issues of material factual disputes, namely, whether Plaintiff Tordini exercised such an exclusive level of control over Our Turn's profits that his fraudulently induced ownership

---

[1] As described in the Complaint at Preamble and ¶¶ 38-59, A. at 2-3, 13-18, the "Coyle Defendants" refers to Robert N. Coyle, Sr., Carol Coyle, Vernon Coyle, Linda Coyle Price, The Coyle Family Irrevocable Family Trust, RNC Investments, LLC, Landvest, LLP, Landvest, LLP II, Landvest, LLP III, O'Tay, LLC, Alivest, LLP, Apple Development Services Corp., R.N.V.C., Inc., JC Real Estate Investments, LLC, Nine, LLC, Ten Investments, LLC, Robert N. Coyle, Sr. & Sons Real Estate, Inc., Memory, LLC and LVJ, LLC.

[2] As specifically pled, the Defendants' ongoing Ponzi scheme begun in 1997 is presently destroying Our Turn, as it converts and funnels hundreds of thousands of dollars into various other alter ego shell companies owned and controlled by the Coyle Family Defendants.  <u>See</u> Complaint ¶¶ 1-15, 24-29, 65-72; A at 4-10, 19-24.  Their Ponzi scheme fraudulently induces millions of dollars in loans from banks based on phony insider appraisals of real estate, false financial statements and, since their acquisition of a title insurance company known as Savings Abstract Company, the submission of false title insurance reports. <u>Id.</u> at ¶¶ 2, 5, 65-72, 159-175; A. at 4, 5, 19-24, 43-46. The Defendants then convert the fraudulently induced loan proceeds, and the collateral supporting the loans, to, <u>*inter alia*</u>, the Coyle Family Defendants, thereby attempting to insulate millions of dollars from judgments from the many lenders. <u>Id.</u> at ¶ 21; A. at 8. To fuel the Ponzi scheme by making "current" payments on the fraudulently induced loans, the Defendants transfer the collateral among their companies at inflated values to create "paper profits", pay phony "administrative" fees from one alter ego company to another, and have their one profitable company, Our Turn, fund their other alter ego shell companies. <u>Id.</u> at ¶¶ 8, 24; A. at 5, 8.

interest in Our Turn LLC is not a "security" under the fact-sensitive analysis required by the Supreme Court in <u>SEC v. Howey</u>, 328 U.S. 293, 297-298 (1946).  As set forth herein, the Coyle Defendants are wrong on the controlling Law, and their arguments are contradicted by their own multiple sworn judicial admissions.

This Court's fact-based analysis begins with the Coyle Defendants' several judicial admissions that from "day one" the profits of Our Turn were **not derived, in any part**, from Plaintiff Tordini's efforts, including, <u>inter alia</u>, "Tordini was responsible for virtually none of the income generated by Our Turn and any success on the part of Our Turn was the result of the efforts of other individuals, not [Plaintiff] Tordini…"  A. at 83.

As plead, and confirmed by the Coyle Defendants' several judicial admissions, Plaintiff Tordini: became <u>their</u> executive employee subject to their decisions regarding every aspect of Our Turn; purchased the minority ownership interest in Our Turn knowing that he would never have control over Our Turn; and, knew that, while he would manage Our Turn's day-to-day affairs as its senior manager, he would not be responsible for generating its profits.  A. at 74, 83, 122, 123, 128 131, 132.  Plaintiff Tordini's minority interest in Our Turn, accordingly, fits squarely within the definition of a security under this Circuit's standards. This fact-sensitive motion must be denied.

## II.    FACTS COMPELLING DENIAL OF THE MOTION

### A.    The Defendants Misrepresent And Fail To Disclose Their Fraudulent Financial Scheme To Induce Plaintiff Tordini To Purchase Securities In Our Turn.

As specifically pled, beginning in 1997, the Coyle Family Defendants[3] and their financial advisors, Defendants Bruce Bryen CPA and Bryen & Bryen, LLP (collectively, "Bryen Defendants"), commenced a Ponzi scheme to enrich the Coyle Family Defendants with millions of dollars in fraudulently induced loans, the vast majority of which they can never, and do not intend to, repay in full. *See* Complaint, ¶¶ 1 – 31; A. at 4-11.

Specifically, through their wholly owned alter ego companies named in the Complaint, the Coyle Family Defendants transfer millions of dollars in fraudulently induced loans, which are eventually paid to the Coyle Family Defendants and then secretly transferred to non-borrower Defendants R.N.C. Investments and the Coyle Family Trust to eliminate any recovery of the loan proceeds from the lenders, the Internal Revenue Service, and, the City of Philadelphia. *See* Complaint, ¶¶ 10, 21, 126; A. at 6, 8, 36.  Defendant Robert N. Coyle, Sr. admits to being the operating manager of all of the Defendant alter ego shell companies. A. at 114-120, 122, 123-125, 127, 134, 137, 143-144, 146, 148-150.

In 2000, to further implement their fraudulent financial scheme, the Coyle Family Defendants decided to purchase their own title insurance company to issue fraudulent title insurance policies representing clear title on the same property to different banks. Their Ponzi scheme then obtained loans based on mortgages to different banks collateralized by the same

---

[3] As defined in the Complaint, the "Coyle Family Defendants" are Defendants Robert N. Coyle, Sr., Carol Coyle, Vernon Coyle, Linda Coyle Price, RNC Investments LLC and the Coyle Family Irrevocable Trust. *See* Preamble of the Complaint, ¶¶ 38-44,  A. at 3-4, 13-14.

properties and fraudulently insured by a captive title insurance company, namely, Our Turn. *See* Complaint, ¶¶ 12, 89-103, 159-172; A. at 6, 30-32, 43-45.

However, to effectuate their fraudulent scheme in a regulated industry such as title insurance, the Coyle Family Defendants, through their controlling manager, Defendant Robert N. Coyle, solicited Plaintiff Tordini, a Philadelphia banking executive, to leave his employment with Sun Bank, and become the President and Chief Operating Officer of Derivative Plaintiff Our Turn for a period of three years pursuant to an Employment Agreement. *See* Complaint, ¶¶ 13, 104-120; A. at 6-7, 32-35.  To further induce Plaintiff to manage Our Turn for them, the Coyle Family Defendants agreed to sell him a minority ownership interest in a newly formed alter ego shell company, then known as OT, Inc., a Pennsylvania corporation, to Plaintiff Tordini[4].  A. at 112.

To fraudulently induce Plaintiff Tordini to purchase this minority ownership interest, Defendant Robert N. Coyle misrepresented to Plaintiff Tordini that their new title insurance company would be a holding company which would acquire and manage several companies related to the real estate finance business, including title insurance, appraisal services, loan brokerage and real estate brokerage. *See* Complaint, ¶¶ 14, 104-120, 186-195; A. at 7, 32-35, 47-50.  The Coyle Family Defendants further misrepresented, and failed to disclose to Plaintiff Tordini, the true financial condition of the Coyle Family Defendants' alter ego shell companies, and their real reason for purchasing the new company, namely as a vehicle to implement the Defendants' pattern of fraudulent misconduct. *See* Complaint, ¶¶ 15, 104-120, 186-195; A. at 7, 32-35, 47-50.

---

[4] It is unclear what happened to OT, Inc.  By November 22, 2000, the Coyle Family Defendants and the Bryen Defendants elected to call their newly formed company, Our Turn.

The Defendants further failed to disclose that, on the same day, November 22, 2000, that they induced Plaintiff Tordini to purchase this security, the Coyle Family Defendants' fraudulent financial statements induced a $1,000,000 loan for another of their alter ego companies, O'Tay LLC and a $500,000 loan for their other new company, Our Turn's, purchase of a title insurance company known as Savings Abstract Company. *See* Complaint, ¶¶ 16, A. at 7. Both loans were guaranteed by Defendants Robert N. and Carol Coyle, and further secured by mortgages on several properties owned by one or more alter ego Defendant companies controlled by the Coyle Family Defendants. *See* Complaint, ¶¶ 17; A. at 7.  The Coyle Family Defendants never disclosed to Plaintiff, or the lenders, that their personal and business financial statements created by them, and the Bryen Defendants, submitted to induce the Our Turn loan, and millions of dollars in other Coyle Family Defendants' loans, were fraudulent, including, inter alia, the guaranty of Defendants Robert N. and Carol Coyle. *See* Complaint, ¶¶ 19, 69, 74; A. at 7-8, 23, 24.

On November 22, 2000, induced by the Coyle Family Defendants' and Bryen Defendants' fraudulent misrepresentations and material omissions, as alleged herein, Plaintiff Tordini purchased a twenty-five percent (25%) ownership interest in Our Turn in consideration for, inter alia, agreeing to leave his executive banking position to manage Our Turn.  *See* Complaint, ¶¶ 20, 104; A. at 8, 32.

**B.  Defendants' Admitted Exclusive Control Over Our Turn**

Until the present motion, the Coyle Defendants consistently admitted that they controlled all issues relating to hiring[5], check signing, income, profits, and all aspects of the formation of Our Turn. The Coyle Defendants sold securities in Our Turn to Plaintiff Tordini in exchange for

---

[5] On September 14, 2001, Defendants Robert N. Coyle and R.N.C. Investments retaliatorily fired Plaintiff Tordini as an Our Turn executive when he protested against their fraudulent financial misconduct.

5

his agreement to manage Our Turn as an executive. However, Plaintiff Tordini never had any involvement in the creation of the profits or decision making of the company –- as Defendants have repeatedly admitted.

Indeed, as Defendant Robert N. Coyle testified, "**[f]rom day one, John Tordini knew that I would be in control of Savings Abstract, from day one.**"  A. at 128.  (emphasis added).  This dispositive judicial admission[6] is confirmed in sworn pleadings filed by the same counsel who filed the instant motion:    "**. . .[Plaintiff]  Tordini was responsible for virtually none of the income generated by Our Turn and any success on the part of Our Turn was the result of the efforts of other individuals and not [Plaintiff] Tordini. . .**" A. at 83.

As Defendant Robert Coyle, Sr. further judicially admitted:

Q.    And what is your position in Our Turn?

A.    I believe I was the operating manager of the company.

Q.    Of what company, Our Turn?

A.    Our Turn, Savings Abstract.

Q.    The operating manager of all those companies?

---

[6] The Court of Appeals for the Third Circuit has held that "judicial admissions . . . are admissions in pleadings, stipulations etc. which do not have to be proven in the same litigation." Giannone v. United States Steel Corp., 238 F.2d 544, 547 (3d Cir. 1956). Defendant Coyle's deposition testimony and pleadings are laced with judicial admissions.  See Riseman v. Advanta Corp., 2001 U.S. Dist. LEXIS 15760, *44 (E.D. Pa.)("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.")(quoting Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc., 976 F.2d 58, 61 (1st Cir. 1992) (citing Second, Fifth, Sixth, and Eighth Circuits)).

These admissions doom Defendants' instant motion.  Defendant Robert N. Coyle's sworn testimony unequivocally confirms his pleadings that he, not Plaintiff Tordini, had absolute control over the profits and losses of Our Turn.  These admissions are conclusively binding on Defendant Coyle.  O'Neil v. Four States Builders & Remodelers, Inc., 484 F. Supp. 18, 20 (E.D. Pa. 1979)(citing Giles v. St. Paul Fire & Marine Insurance Co., 405 F. Supp. 719, 725 n. 2 (N.D.Ala.1975); Hall v. United States, 314 F. Supp. 1135, 1137-1138 (N.D.Cal.1970)). Therefore, no factual issue could be raised by the Defendants to dispute these judicial admissions.

Further, Defendants are judicially estopped from contradicting these unequivocal admissions.  See e.g., In re Chambers Devel. Co., Inc., 148 F.3d 214, 229 (3d Cir. 1998).  In In re Chambers Devel. Co., the court found that the doctrine of judicial estoppel was "designed to prevent litigants from playing fast and loose with the courts."  Id. That is exactly what the Coyle Defendants are attempting to do here.  Contrary to their repeated judicial admissions that Plaintiff Tordini had no authority at Our Turn, Defendants now disingenuously attempt to do an about-face.

A.      Yes.

Q.      Did you cease to be the operating manger?  Did you stop being operation manger of Our Turn at some point?

A.      Cease?

Q.      Stop, did you stop, cease, c-e-a-s-e, or stop being operations manager of Our Turn at some point in time?

A.      Operating manager also means to me having the authority to do whatever prudent that I decided to do, whether it was with Our Turn or Savings Abstract.

**Q.      You're the operating manager, you say of both Our Turn and Savings Abstract?**

**A.       I believe so.**

**Q.      And it's fair to say that you feel that your authority as operating manager of those entities is without limit?**

**A.      Right.**

Q.      Whatever you say goes, correct?

A.      It depends.

Q.      On what?

A.      The situation.

Q.      Is anyone in a position to veto what you say?

A.      I'm not sure of that.

**Q.      Was there ever a circumstance since you've been operating manager of Our Turn, that anyone vetoes one of your decision[s].**

**A.      No.**

See A. at 125-127.  (emphasis added).[7]

---

[7] Defendant Robert N. Coyle, Sr. has at other times stated that he was also the "chairman" and the "watchdog" of Our Turn who had responsibility to check payroll, expenses and day-to-day operations:

Defendant Robert N. Coyle further testified:

Q.    Now did Mr. Tordini have the authorization to give bonuses?

A.    No.

. . .

Q:    Did Mr. Tordini have authorization to give her a gift?

A.    No, not without my authorization.

**Q:    Okay.  Who would have the authorization to decide whether or not a temporary loan could be given?**

**A:    I am 90 percent owner of that company.  When it comes to the management, I would make those decisions.**

Q:    Okay.  Is this a corporation?

A:    No, it's a limited liability corporation.

Q:    Okay, so who are the officers?

A:    [RNC] Investments is the entity that owns 90 percent of Our Turn/Savings Abstract.    I am the operating manager of RNC Investments.

Q:    And do you own part of [RNC] Investments?

A:    No, I – no.  I believe I own one percent.  But I am in control of all decisions through the limited liability corporation rules and regulations.

Q:    And who owns the rest of the company?

A:    Supposedly, ten percent John Tordini owned at that present time.

Q:    Would Mr. Tordini have to go through you to tell you that he wanted to give a bonus to an employee, or a loan to an employee?

---

A.    I think I was the – I was the overall watchdog.  I was watching.
Q.    Did you have any other role?
A.    I was the chairman, the operating manager.
Q.    As a watchdog, what did you do to be an overall watchdog?
A.    I was checking the payroll, checking the expenses, checking the day-to-day operations.

A. at 122-123.

A:    I have met with Mr. Tordini for the last ten months, or nine months, before he was terminated. And I instructed him that there would be no increases in salary, bonuses, or whatsoever, back in March. That he was not to hire anyone.

**Q:    Okay. So in other words, you were the person who was in charge of whether there would be an increases, bonuses, et cetera?**

**A:    Well, I was the last decision maker. John would bring it to me...**

**Q:    Okay.**

**A:    . . . and I would decide whether we would do it or not.**

**Q:    All right. How did that come about if you only had one percent and he had ten percent, that you were the last decision maker?**

**A:    [RNC] is the limited liability corporation who owns 90 percent of it. I have the authority and the authorization to do any and all decision making in regard to Our Turn/Savings Abstract and [RNC].**

A. at 154-155.

The Coyle Family Defendants' control extended to directing which persons could sign checks, which persons should provide training and demanding that their family members obtain check-signing authority with Our Turn, over Plaintiff Tordini's objections. A. at 162.

Further, it is undisputed that the Coyle Family Defendants, through their agent, Defendant Robert N. Coyle, controlled all of the decisions, including the decision to who to hire and the decision to fire Plaintiff Tordini from his employment with their company:

Q.    Who makes the decision whether someone is going to be an independent contractor or an employee for your companies?

A.    I do.

\*            \*            \*            \*            \*

9

Q.    When did you decide to fire [Plaintiff Tordini]?

A.    Oh, I guess – I believe ten days prior to this.

Q.    And does that mean on September 4th?

A.    Approximately.  **I decided that I was going to make a decision to terminate Mr. Tordini**.

A. at 130-131. (emphasis added).

Further, the November 22, 2000 Operating Agreement is rendered meaningless by the Coyle Defendants.  Again, as Defendant Robert N. Coyle admitted:

Q.:    Mr. Coyle, when last you testified on direct examination, you stated, John Tordini didn't have the authority to grant a semi-annual bonus.  Is that correct.

A:    Right.

. . .

Q:    Okay.  Sir, you have stated Mr. Tordini did not have the authority to grant a semi-annual bonus?

A:    Right.

Q:    Okay.  And it would be your testimony that he didn't have the authority to grant a gift, correct?

A:    Right.

Q:    And he didn't have the authority to grant a loan?

A:    Right.

Q:    **Okay.  And now John Tordini in effect also, if you look at 9D –9E [of the Operating Agreement], had the ability to borrow money, to make issue, accept, endorse, and execute promissory notes?**

A:    **Not without my authority.**

. . .

Q:    **Okay.  And how about powers of the manager.  That's what we're looking at here.**

10

> **A:**        **I'm the managing member.  I'm the one that has the powers.  He has certain powers, but I have the oversee powers.**

A. at 155-161.

The Coyle Defendants' judicial admissions confirm their absolute control over Our Turn,

when they plead, by the same lawyers that filed the instant motion that:

> **. . . Our Turn may make a profit in 2001.  It is denied that any such profit, if made, will have anything to do with Tordini's leadership or efforts, or that Tordini "obtained profits".**

> . . .  RNC Investments is a ninety percent (90%) owner of Our Turn, and, as majority owner has the ultimate right to control the affairs of Our Turn.

> **. . .  Tordini was responsible for virtually none of the income generated by Our Turn and any success on the part of Our Turn was the result of the efforts of other individuals not Tordini. . .**

> . . .  RNC Investments was and continues to be the majority member of Our Turn entitled to manage and direct the operations of Our Turn.  …Defendant Coyle, through his interest in RNC Investments likewise had the right to mange and control the operations of Our Turn.

A. at 75, 82, 84, 87.

**C.    Plaintiff Tordini's Lack Of A Role In Forming Our Turn.**

Again, until the filing of the present motion, it was undisputed that Plaintiff Tordini had

no, or a very limited role, in forming Our Turn. As Defendant Robert Coyle judicially admitted:

> Q.    [W]hat about where it says, he was reviewing and preparing business plans.  Do you know of any business plans that he was reviewing?

> A.    It was me and [Defendant Bruce Bryen], we all sat down and talked about it.  I don't know about business plans.

> Q.    How about financial analyses?

> A.    It was me and Bruce [Bryen] did that.

Q.      Not John Tordini?

A.      John could have been in it, but it was me and Bruce [Bryen] that
        did most of it.  John did not have knowledge or the insight of my
        businesses as to how to plan a financial analysis, Bruce did.  John
        didn't know about my business, where my strengths are, where my
        credibility was in regard to where to borrow money.  John didn't
        know that.  He didn't know my inside information about my
        corporations.  It was me and Bruce [Bryen].  So that's why its
        denied.

Q.      And did he pull that loan package together?

A.      He has some – he had put a package together which was a package
        that was entailed with stuff that Bruce Bryen gave him and I gave
        him.  **But it wasn't John Tordini who actually brought this
        thing together and took it to a bank**.

Q.      Who took it to the bank?

A.      It was me, Bruce Bryen and I instructed John to take it to Sun
        Bank or to First Republic Bank.  That's –that was told to John.

Q.      So, John Tordini took this loan request package to Sun Bank and to
        First Republic Bank?

A.      Its either one of them. . .  So then I said to John, no problem, we'll
        collateralize the  homes that I have and Landvest whatever; as a
        second mortgage.  **That was my idea.  That's how I got it
        approved.  Not because of John Tordini.  If John Tordini
        would have took this, we would have lost it.  I came up with the
        collateralization of second mortgages on the property that First
        Republic had.  And that's what made the approval on this
        loan, not John Tordini.**

A. at 139-142. (emphasis added).

Further, the Coyle Family Defendants never intended for Plaintiff Tordini to have any

role in Our Turn beyond being their employee and manager:

Q.      Did Mr. Bryen review this Employment Agreement prior to the
        time you signed it?

A.      I believe he reviewed it, right.

Q.    And did he express any dissatisfaction?

A.    There was one item in there that John wanted to – which I picked up that John wanted to do, have exclusive right to have the business, buy the business and no one else.  And I said no way, that is not going to happen.  **My family is the one I'm starting this business for, and my daughter will be up there, and she'll learn the business, and she's going to take over.  So if something happens to you, you'll just get bought out whatever is there, so I picked that up.**

A. at 132-133. (emphasis added).

The Coyle Defendants' judicial admissions are confirmed in their sworn pleadings, filed

by the same lawyers who filed the instant motion, where, under penalty of perjury, they swear:

. . . It is denied that through Tordini's "credibility" and "business experience", Tordini arranged the financing for the purchase of Savings Abstract Company.  Tordini assisted in but was not responsible for Defendants obtaining financing.

**. . . on or about November 22, 2000, RNC Investments and Tordini formed Our Turn, LLC.  It is denied that the formation of that company was the result of Tordini's efforts.**

. . . during the time Tordini was employed by Our Turn, the offices of Our Turn were moved to a larger office which contained computer and other equipment.  It is denied that Tordini was responsible for the same.

A. at 71 and 74.

These judicial admissions create disputed material issues of fact that compel the denial of

the Coyle Defendants' instant motion.

**D.    Plaintiff Tordini Confirms His Limited Role As a Manager**

During three days of depositions from June 11-13, 2002, Plaintiff Tordini confirmed

Defendant Robert N. Coyle Sr.'s testimony that he was only serving as an executive manager on

a day-by-day basis, and understood at all times that he had a passive investment.  While the notes

of testimony have not yet been transcribed, Plaintiff will, if necessary, supplement this record to

further confirm that the Coyle Family Defendants controlled all aspects of Our Turn, including hiring, firing, income generation, or even training issues for new employees. Plaintiff Tordini has never claimed that he controlled Our Turn's profits, or that Our Turn's success was due to his managerial efforts alone.[8]

### III.    ARGUMENT

This Court's application of long-standing Supreme Court and Third Circuit controlling caselaw to the Coyle Defendants' litany of judicial admissions, as discussed supra, compels the denial of their motion because, at a minimum, there are several genuine disputed issues of material fact regarding whether Plaintiff Tordini's minority ownership interest in Our Turn is a security protected by federal securities laws. SEC v. Howey, 328 U.S. 293, 297-98 (1946). *See also* United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 847-8 (1975); Tchereepin v. Knight, 389 U.S. 332, 336 (1967).

There is no bright-line rule in the federal securities statutes, administrative rules, or caselaw regarding whether a limited liability company interest is a "security".[9] As such, this Court must examine the facts surrounding Plaintiff Tordini's interest in Our Turn to determine whether it meets the U.S. Supreme Court's test for an investment contract, which the Securities and Exchange Act explicitly lists as a protected security. Howey, 328 U.S. at 297-98.

---

[8]  Discovery now confirms the need for equitable relief, and the nature of the derivative damages. While Plaintiff Tordini was Our Turn's executive, Our Turn exceeded its budgets, even with the improper "loans" and "consulting" fees that the Coyle Family Defendants paid to themselves and their alter ego shell companies. Following Plaintiff Tordini's firing without cause for objecting to the Defendants' misconduct, Our Turn is losing substantial sums of money, is over 50% off of its budget, but continues to pay well over one hundred thousand dollars to the Coyle Family Defendants as non-budgeted phony "fees". When Plaintiff Tordini objected to Our Turn's paying a single $50,000 check to the Coyle Family Defendants, and an increasing amount of monthly "consulting" fees, Defendant Robert N. Coyle, Sr. directed him to "just write the f….n check".

[9]  In contrast, the Pennsylvania General Assembly has specifically defined "security" for purposes of its securities anti-fraud statutes to include limited liability company interests. See   70 P.S.C.A § 1-102(t).

As this Court must undertake such a factual analysis, it cannot grant any preliminary motion to dismiss[10]. Further, the facts – even as developed at this early stage of the case -- are genuinely disputed, including by the Coyle Defendants themselves, thus precluding summary judgment on this issue[11]. Accordingly, the Coyle Defendants' motion to dismiss or their premature motion for summary judgment, must be denied.

## A.    Plaintiff Tordini's Minority Ownership Interest Is A Security.

Plaintiff Tordini's ownership interest in Our Turn satisfies the U.S. Supreme Court definition of investment contract articulated in Howey, supra, and, is therefore protected as a security under the Securities and Exchange Act (hereinafter, "The Act").

---

[10] In evaluating a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Third Circuit requires this court to accept as true all factual allegations in the complaint, as well as all reasonable inferences that can be drawn therefrom, and construe them in the light most favorable to the non-moving party. Bell Atlantic-Pennsylvania, Inc. v Pennsylvania Public Utility Commission, 107 F.Supp. 653, 659 (E.D.Pa. 2000)(Katz, SJ)(citing Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3rd Cir. 1990)). After deeming as true all material averments set forth in the complaint, as well as all inferences therefrom, the court may dismiss the action under Fed. R.Civ.P. 12(b)(6) only in the rare instance when it is entirely clear that the complaint fails to set forth facts upon which the law permits recovery. Id.

Here, there is no dispute that the Complaint specifically pleads that the Our Turn interests are securities. See Complaint, ¶ 185, A. at 47. Accepting as true all factual allegations in the complaint, the Coyle Defendants concede that additional evidence is necessary to review this issue, and they attach documents not part of the Complaint, namely, the state court complaint, the employment agreement and the operating agreement.

[11] Because discovery is continuing pursuant to the Court's May 6, 2002 and May 28, 2002 Orders, Defendants' motion is grossly premature. See Kolodij v. Consolidated Rail Co., 1998 WL 792153 at *2 (E.D.Pa., Nov. 10, 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n. 5 (1986) (noting that a court may deny a premature summary judgment motion)); see also Plaintiff's Rule 56(f) Declaration outlining the need for additional discovery and opposition to premature consideration of summary judgment motion at A. at 163-164. Courts are inherently wary of granting motions for summary judgment that are prematurely filed. Syncor International Corp. v. Mody, No.CIV.A. 98-6284, 1999 WL 257758 at *3 (E.D.Pa., April 29, 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986)). Because the non-moving party has not obtained full discovery, the court must apply Fed.R.Civ.P. 56(f) to safeguard the opposing party from the prejudice of a premature motion. Id.

This Court has determined that when reviewing a summary judgment motion under Rule 56 that it must not weigh the evidence and determine the truth or falsity of factual averments. Thompson v. Fare, Jr., 173 F.Supp.2d 368, 370-71 (E.D.Pa. 2001). Rather, the court simply determines whether or not a genuine issue for trial exists. Id. In doing so, the court is again bound to view all facts in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. Id. The drastic nature of summary judgment requires that any doubt is to be resolved in favor of denying the motion and continuing discovery. See SEC v. Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir. 1997) (all doubts must be resolved in favor of the non-moving party); Hollinger v. Wagner Mining Equipment Co., 667 F.2d 402 (3d 1982) (characterizing summary judgment as "drastic remedy", and finding "that courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties.").

The definition of "security" embodies a flexible rather than a static principle, capable of adaptation to the countless schemes devised by those who seek to use the efforts and investment of others on the promise of profits. <u>Howey</u>, 328 U.S. at 299.  Aware that the Securities Acts are remedial legislation, which must be broadly construed, the Supreme Court has continuously reiterated that the inherently flexible nature of the securities laws mandates that a factual inquiry examining the economic realities of the transaction must be undertaken, in a practical manner, to determine whether the investment is a security.  <u>Knight</u>, 389 U.S. at 336.  The Supreme Court has declared that the interpretation of the term "security" is both in broad and in general terms to enable the term to encompass the definition of the many types of instruments that in our commercial world fall within the ordinary concept of "security".  <u>Forman</u>, 421 U.S. at  847-8.

An investment contract is one of the many expressly enumerated equity investments protected by the Act.[12]  The Supreme Court defines an 'investment contract' as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or third party…." <u>Howey</u>, 328 U.S. at 298.

The <u>Howey</u> three prong test requires: (1) an investment of money; (2) in a common enterprise; and (3) with profits derived solely from the efforts of others. <u>SEC v. Infinity Group Company</u>, 212 F.3d 180, 188 (3d Cir. 2000)(citing <u>Steinhardt Group Inc. v. Citicorp</u>, 126 F.3d 144, 151 (3d Cir. 1997)); <u>SEC v Bennet</u>, 889 F.Supp 804, 808 n.3b (E.D. Pa. 1995).[13]

---

[12] The broad and inclusive definition of security which our federal courts are called upon to interpret is "any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, pre-organization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing …"
15 U.S.C. § 78c(a)(10) (2000).

[13] Federal courts have repeatedly found, based upon a factual analysis under <u>Howey</u>  that an interest in a limited liability company is a security protected by the Act.  <u>See e.g.,</u> <u>SEC v. Parkersburg Wireless L.L.C.</u>, 991 F.Supp. 6,

The Coyle Defendants **concede** that Plaintiff Tordini's ownership interest satisfies the first two prongs of the Howey test, leaving only a fact-sensitive analysis of whether any profits payable to him were derived solely from the efforts of others.[14]

The third and final prong of the Howey test requires only that a third party other than the plaintiff investor contribute managerial and entrepreneurial efforts to generate profits. Forman, 421 U.S. at 852; International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 561 (1979). Conversely, even if a passive investor such as Plaintiff Tordini is required to exert some effort if a profit was to be achieved does not preclude a finding that a particular plan or adventure is an investment contract. SEC v. Glen W. Turner Enterprises, Inc., 474 F.2d 476, 482 (9th Cir. 1973). Thus, the appropriate test is realistic and measures "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which effect the failure or success of the enterprise." Id. (emphasis and underscore added).

The Third Circuit properly focuses on the economic reality of the agreement. Steinhardt, 126 F.3d at 152 (citing Howey, 328 U.S. at 299). The Third Circuit has adopted the interpretation of "investment contract" which refuses "to read literally the term 'solely,' as used in the Howey test, when evaluating the efforts of the investor." Steinhardt, 126 F.3d at 153 (citing Lino v. Citing Investing Co., 487 F.2d 689, 692 (3d Cir. 1973) (holding that an investment contract can exist where the investor is required to perform some duties as long as they are limited and nominal and have little effect upon receipt by the participant of the benefits promised by the promoters)).

---

7-8 (D.D.C. 1997)(applying Howey test to show interest was an investment contract and stating, "it is clear that the interests sold in Parkersburg Wireless, LLC ('PWLLC') are securities").

[14] The Coyle Defendants concede, as they must, that Plaintiff Tordini made an investment in a common enterprise, as defined by the controlling caselaw. Their only argument is disingenuously based on their recently contrived change of position to conceal their central role in controlling Our Turn's.business.

Courts have repeatedly held that an owner in an LLC does not have sufficient control over the partnership and is dependant upon others for their profits if he is incapable of exercising power or is dependant upon the expertise of the promoter/manager. *See* SEC v. Friendly Power Co., LLC, 49 F.Supp.2d 1363, 1370 (S.D. Fla. 1999). Here, Defendants judicially admit that from "**day one" the profits of Our Turn were** not derived, in any part**, from Plaintiff Tordini's efforts.** A. at 129. Defendant Robert N. Coyle, Sr. repeatedly admitted under oath that Plaintiff Tordini was incapable of exercising even the most ministerial tasks, including hiring employees, providing raises, providing bonuses, engaging in marketing and borrowing money. A. at 155-156.

In Friendly, the investor plaintiffs were empowered with managerial responsibilities under the partnership agreement. Id. The district court, however, properly looked beyond the language of the agreement to find the investors were to perform only ministerial acts and would not exercise any meaningful control. Id. The district court found that the ownership interests were securities even when the investors were: (1) required to actively participate in the important business decisions; (2) required to participate in one or more management committees; (3) required to be involved in some of the day-to-day management of the business and; (4) required to solicit ten customers per month. Id. The Friendly court, applying the "economic reality" test, found the interest in the LLC was a security even though the investors possessed **managerial powers test the investor's were dependant on the efforts of the managers/promoters.** Id. (emphasis added). [15]

---

[15] The Coyle Defendants' reliance on Keith v. Black Diamond Advisors, Inc., 48 F.Supp.2d 326 (S.D.N.Y. 1999) is misplaced. In Black Diamond, the Court held that an LLC could be a security, when as here, the plaintiff "can demonstrate that in spite of the form the partnership took, [the investor was] so dependant on the promoter or on a third party that in fact [he was] unable to exercise meaningful power." Id. at 333-34 (other citations omitted). However, the Black Diamond members were endowed with a broad range of rights, from both under both the operating agreement and New York partnership law including the right to vote, the right to participate in detailed cash flow distribution structure and, most importantly but lacking instantly, protection from other members acting

Even investors who are expected to perform tasks on behalf of the LLC can nonetheless own a protected security interest. See id.; see also Tcherepin, 389 U.S. at 336 (citing Howey, 328 U.S. at 298) (holding that in searching for the definition and scope of the word "security", form should be disregarded for substance and the emphasis should be on the economic reality)); SEC v. Shreveport Wireless Cable Television P'ship, No.CIV.A. 94-1781, 1998 WL 892948 at *7 (D.D.C. Oct. 20, 1998)(denying summary judgment after focusing on which parties exercised essential managerial powers over the investment and finding "if, however, the investor's profits after the time of sale are primarily dependant upon the promoter's efforts, the investor should have the protection of the federal securities laws.").[16]

Here, the Coyle Defendants judicially admit that Defendant Robert N. Coyle, Sr. maintained ultimate and absolute control over Our Turn. A. 157-161. As the decision maker for Our Turn, he decided issues of salary, bonuses, and hiring/firing. His management decisions were final, and not subject to review. A. at 126-128, 130-131, 154-161. Further, as set forth herein, the Coyle Defendants have judicially admitted that Plaintiff "Tordini was responsible for virtually none of the income generated by Our Turn and any success on the part of Our Turn was the result of the efforts of other individuals, not [Plaintiff] Tordini". A. at 84.

---

on behalf of the company. Id. at 333. Plaintiff Tordini's only protection from the other equity owners, all of whom are Coyle family or Coyle family controlled Defendants, is judicial recourse sought with this lawsuit.

[16] Incredibly, the Coyle Defendants cite authority for the proposition that the third prong of Howey that the economic realities test does not turn on the amount of the power that an investor exercises, but the amount of the power that the investor actually possesses. See Defendant's Motion to Dismiss at p. 11 (citing Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236, 240-41 (4th Cir. 1998) and Hirsch v. Dupont, 396 F. Supp. 1214, 1224-25 (S.D.N.Y. 1975). The Coyle Defendants' new position that Plaintiff Tordini possessed authority which he did not exercise, is internally inconsistent with and belies both their countless references and citations to (1) his "leadership" role, see Defendants' Motion to Dismiss at pp 2-3, 8-9' and (2) he had absolutely no power,. supra. at pp. 12-23. The Coyle Defendants cannot not possibly be allowed to represent three different materially conflicting positions regarding the very same issue to this Court: (1) Plaintiff Tordini had absolutely no power while, at the same time, he (2) had powerful authority which he fully exercised throughout formation and management, while, at the same time, (3) he had powers but chose not to exercise them. This Court must deny this motion and permit the jury to resolve the material disputed facts created by the Coyle Defendants' conflicting admissions.

The Coyle Defendants' citation to <u>Great Lakes Chemical Corp. v. Monsanto Co.</u>, 97 F.Supp.2d 376 (D.Del. 2000), is inapposite.[17]  Unlike the present case, the rationale of <u>Great Lakes</u> applies in a single member owned and dominated LLC (Chemical Corp. purchased 100% interest in the LLC), and the court did not get beyond the second prong of the <u>Howey</u> test.[18]

The <u>Great Lakes</u> case has no bearing on the facts presented instantly.  Here, there is more than one member, and the Coyle Defendants repeatedly admit that they, and only they, were responsible for the generation of profits and for each and every decision, including decisions relating to check writing, hiring, firing, business plans, loans and even the training of new employees.  As the Coyle Defendants have judicially admitted, <u>inter</u> <u>alia</u>, **"Tordini was responsible for virtually none of the income generated by Our Turn and any success on the part of Our Turn was the result of the efforts of other individuals, not [Plaintiff] Tordini…"**  A at 84.

## B.    This Court Must Retain Jurisdiction Over All Claims

The Coyle Defendants' argument seeking the dismissal of the related state law claims, including derivative claims brought on behalf of Our Turn, must also be denied.  The Coyle Defendants do not challenge the legal sufficiency of any claim, other than one prong of the <u>Howey</u> test, as discussed, infra.  Even assuming, *arguendo,* that this Court were to preliminarily

---

[17] Defendants also cite Great Lakes directly and inappropriately for the proposition that if this court finds Tordini's interest is not a security, "it must dismiss the remaining state claims." <u>See</u> Defendants' Motion to Dismiss at p. 15. This is not good authority, 28 U.S.C. 1367(c)(3) controls this issue and gives the court discretion in retaining jurisdiction. <u>See</u> *infra*, p. 21.

[18] There, reviewing a single owner LLC, the court stated: "In this case, Great Lakes, bought 100% of the Interest of NSC from Monsanto and STI. Great Lakes, accordingly, did not pool its contributions with those of other investors, as is required for horizontal commonality.  After the sale, Monsanto and STI retained no interest in NSC, so it cannot be said that fortunes of Great Lakes were linked to those of defendants, as is required for vertical commonality.. . The Court concludes that Great Lakes did not invest in a common enterprise." <u>Id</u>. at 390.  Thus, unlike here, when the court in <u>Great Lakes</u> continued to evaluate the third prong in <u>Howey</u>, profits solely from the efforts of others, it found that Great Lakes 100% sole ownership created a power to remove managers without interference and therefore: "Great Lakes' authority to remove managers gave it the power to directly affect the profits it received from NSC.  Thus, the court finds Great Lakes did not come solely from the efforts of others."

dismiss the federal securities claim by deciding the fact issues raised by the third prong of the <u>Howey</u> test, this Court should, given the ongoing efforts of the parties in mid-discovery, and the significant nature of the very similar claims arising from this ongoing Ponzi scheme, retain jurisdiction to resolve the remaining related claims[19]. 28 U.S.C. §1367(c).   The Defendants' inapposite arguments seeking to dismiss the remainder of this case, regardless of the Court's analysis under the <u>Howey</u> test, must also be rejected.[20]

## IV.   CONCLUSION

The Coyle Defendants' instant motion must be denied, as it seeks to improperly dispose of disputed issues of fact regarding Our Turn's control dynamic.   The Coyle Defendants' multiple judicial admissions confirm that they – not Plaintiff Tordini – controlled the operations, management, finances, profits and success of Our Turn.   Now, for the first time, the Coyle Defendants change their story, and disingenuously claim that Plaintiff Tordini, not Defendants, controlled Our Turn.   Defendants' transparently contrived changed position, however, fails to meet the legal standards under the third prong of the <u>Howey</u> test. It is clear from the Coyle Defendants' own admissions that, from "day one", Plaintiff Tordini had no involvement in the profits, and any success enjoyed by Our Turn was because of the efforts of others. A. at 129.

---

[19] Here, the state and federal laws at issue are almost identical. The anti-fraud provisions of the Pennsylvania Securities Act and the Securities Exchange Act of 1934 are "functionally identical" and may be analyzed together. <u>Dalicandro v. Legalgard, Inc.</u>, No.CIV.A. 99-3778, 2001 WL 1428359, at *2 (E.D.Pa. Nov. 14, 2001) (<u>citing McFeeley v. Florig</u>, 966 F.Supp. 378, 382 (E.D.Pa. 1997)). Under both laws, the plaintiff must prove that (1) in connection with a security's purchase or sale by the plaintiff , (2) the defendant, with scienter, (3) made material misstatements or omissions, (4) upon which plaintiff relied , and that (5) the plaintiff suffered an economic loss because of the defendant's actions. <u>See Scattergood v. Perelman</u>, 945 F.2d 618, 622 (3d Cir. 1991).

[20] To support its baseless request, the Coyle Defendants rely on <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715, 725 (1966), in which the U.S. Supreme Court held that the district court was within its discretion in exercising pendent jurisdiction over the state claim after the federal claims were dismissed.  The Third Circuit has noted that it is **entirely acceptable** under the discretionary principle for a federal court to decide the state claims even if it dismisses the federal claim. <u>Growth Horizons, Inc.v. Delaware County, Pa.</u>, 983 F.2d 1285, 1293 n.14 (3d Cir. 1973).

For all the foregoing reasons, Plaintiff respectfully submits that this Court must deny the

Defendants' Motion to Dismiss or in the Alternative for Summary Judgment.


OF COUNSEL:
ELLIOTT REIHNER SIEDZIKOWSKI
  & EGAN, P.C.               /s/ Mark A. Kearney
                                      JOHN M. ELLIOTT
                                      MARK A. KEARNEY
                                      ROGER J. HARRINGTON, JR.
                                      Union Meeting Corporate Center V
                                      925 Harvest Drive, Suite 300
                                      Blue Bell, PA  19422
                                      (215) 977-1000

DATE:  June 14, 2002               Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Roger J. Harrington, Esquire, hereby certify that on this 14$^{h}$ day of June 2002, I

served a true and correct copy of the foregoing upon the following in the manner set forth:

### First Class Mail and facsimile

Anthony Valenti, Esquire
Cureton Caplan
950B Chester Ave.
Delran, NJ 08075


### First Class Mail

Steven J. Jozwiak, Esquire
2201 Route 38
Suite 200
Cherry Hill, NJ   08002


/s/ Roger J. Harrington
ROGER J. HARRINGTON

mak: 52233.1